Argued April 9, reversed and remanded September 10, 1965

# WIGHTS *v.* STAFF JENNINGS, INC.

405 P. 2d 624

*Robert L. Dressler,* Portland, argued the cause for appellant. On the brief were Buhlinger and Dressler, Portland.

*Howard K. Beebe,* Portland, argued the cause for respondent. With him on the brief were Maguire, Shields, Morrison, Bailey & Kester; David C. Landis;

Koerner, Young, McColloch & Dezendorf; and John Gordon Gearin, Portland.

Before McALLISTER, Chief Justice, and PERRY, O'CONNELL and DENECKE, Justices.

O'CONNELL, J.

This is an action to recover damages for personal injuries suffered by plaintiff in the explosion and burning of a pleasure boat sold by defendant to plaintiff's husband. The jury returned a verdict for defendant. Plaintiff appeals from a judgment dismissing her complaint.

Plaintiff's husband purchased a "Chris Craft Constellation" motor boat from defendant. He installed a butane fuel system for the purpose of supplying fuel to cooking and heating units in the boat. Two butane tanks were mounted in the stern of the boat below the decks. Fuel lines ran from each of the tanks to the center of the boat where they were attached to a pressure valve which controlled the supply of fuel from the tanks. A single fuel line ran along the bottom of the boat from the pressure valve to the stove and heater. Soon after the boat was purchased it exploded and burned.

Plaintiff's case is based upon the theory that the explosion was caused by the ignition of gasoline vapor discharged from a ruptured fuel line or connection between the gasoline fuel pump and the carburetor of the port engine.

It is defendant's theory that the explosion was caused by a defect in the butane system. Defendant contends that the judgment should be affirmed because there was no evidence that the explosion was caused by any defective part of the gasoline fuel system.

A marine salvage expert called as a witness by plaintiff testified that "the fire was caused by gasoline discharging from a rupture or a malfunction between the fuel pump and/or within the carburetor of the port engine."

We are of the opinion that the jury reasonably could have drawn this inference with the aid of the expert's opinion. The objections interposed to the testimony of plaintiff's expert witness were properly overruled by the trial judge.

Since plaintiff was not the purchaser of the boat we must decide as a preliminary matter whether a person not in privity with the seller of a defective product may recover for breach of an implied warranty of merchantability.

A majority of the courts have held that there can be no liability for the breach of an implied warranty unless there is privity between the plaintiff and the defendant.[1] An increasing number of courts have taken the contrary view.[2] The majority view is predicated upon the theory that liability for the breach of an implied warranty in the sale of goods arises solely out of a contractual relationship of the plaintiff and defendant. It has been pointed out, however, that "the obligation is imposed upon the seller, not because he has assumed it voluntarily, but because the law attaches such consequences to his conduct irrespective of any agreement; and in many cases, at least, to hold

---

[1] See cases cited in Anno., 75 ALR2d 39, 46-54 (1961).

[2] See Chapman v. Brown, 198 F Supp 78 (DC Hawaii), aff'd. 304 F2d 149 (9th Cir 1962); Henningsen v. Bloomfield Motors, Inc., 32 NJ 358, 161 A2d 69, 75 ALR2d 1 (1960); Goldberg v. Kollsman Instrument Corp., 12 NY2d 432, 240 NYS2d 592, 191 NE2d 81 (1963). See additional cases cited in Prosser, Torts, 676-78 (3d ed 1964).

that a warranty 'is a contract is to speak the language of pure fiction.' "[8]

■ The word "warranty," with its connotation of contract has tended to obscure the fact that the liability imposed upon the seller for harm resulting from defective goods sold by him may rest entirely upon principles of tort law. Courts which see this have discarded the language of warranty and have described the seller's obligation to furnish goods of merchantable quality in terms of the tort principle of strict liability.[4] With the seller's liability so identified as a part of the law of torts it is apparent that privity of contract is as irrelevant in determining the scope of the seller's strict liability as it is in determining his liability for negligent or intentional conduct. It is now firmly established by our previous cases that where a seller or supplier of chattels is charged with negligent conduct privity is not essential to plaintiff's cause of action.[5] We see no reason for requiring privity if it is assumed that the defendant seller should be strictly liable. The important inquiry is whether the seller not in privity should ever be held strictly liable and if so, under what circumstances.

Until recently the cases have contained little ex-

---

[8] Prosser, Torts, § 95, p. 651 (3d ed 1964); Williston, Liability for Honest Misrepresentations, 24 Harv L Rev 415, 420 (1911).

[4] Greenman v. Yuba Power Products, Inc., 59 Cal2d 57, 27 Cal Rptr 697, 377 P2d 897 (1963) (imposing strict liability in tort upon remote seller); Vandermark v. Ford Motor Co., 37 Cal Rptr 896, 391 P2d 168 (1964) (imposing strict liability in tort upon immediate seller). Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L J 1090, 1134 (1960).

[5] Strandholm v. General Const. Co., 235 Or 145, 155-58, 382 P2d 843 (1963); American Insurers v. Bessonette, 235 Or 507, 384 P2d 223, 385 P2d 759 (1963). Although imposing liability upon remote contractors, these cases stated and relied upon the rule of MacPherson v. Buick Motor Co., 217 NY 382, 111 NE 1050 (1916), imposing liability upon remote sellers.

planation for the imposition of liability upon a seller of goods who is free from fault in the usual legal sense.[⑥] Usually liability has been predicated on a breach of an implied warranty without explaining why the warranty was judicially implied. When the action was brought by the buyer against his immediate seller, it seemed enough that the plaintiff and defendant were parties to a contract, the warranty being born in some mysterious way out of the contractual relationship even in the absence of any promise express or implied in fact made by the seller. When the action was brought by a purchaser against a remote seller, the absence of a contractual relationship was usually regarded as a sufficient explanation for non-liability.

The clearer recognition of the seller's obligation as a species of strict liability in tort has brought with it the effort to analyze more carefully the basis for imposing such liability. The various explanations, both by courts and text writers, for imposing strict liability are concisely summarized by Prosser.[⑦] Mr.

[⑥] "* * * [F]or some obscure reason of public policy the courts think that the risk of loss ought to be transferred to the dealer. They merely use the duplicitous terminology of 'implied warranty' to express (or to conceal?) that idea." Waite, Retail Responsibility and Judicial Law Making, 34 Mich L Rev 494, 518 (1936). Prosser, Torts, § 97, p. 678 (3d ed 1964).

[⑦] Prosser, Torts, § 97, pp. 673-74 (3d ed 1964). He suggests that courts have found the following justifications for strict liability to be most persuasive. (1) Imposition of strict liability upon all suppliers of defective products for harm caused by such products is permissible in view of the overwhelming public interest in human life and safety. (2) The advertising, packaging, and even the marketing of a product constitute representations of its suitability and safety—representations intended to induce purchases in reliance upon the assurances. When such representations lead to disaster, the mere absence of privity between producer and consumer should not prevent liability. (3) The imposition of strict liability is a more efficient and equitable means of achieving a result now possible through a series of suits by each purchaser against his immediate seller.

Justice Traynor in a concurring opinion in *Escola v. Coca Cola Bottling Co. of Fresno,* 24 Cal2d 453, 150 P2d 436, 440-41 (1944), explains the principle as follows:

"* * * Even if there is no negligence * * * public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others, as the public cannot. Those who suffer injury from defective products are unprepared to meet its consequences. The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching the market. However intermittently such injuries may occur and however haphazardly they may strike, the risk of their occurrence is a constant risk and a general one. Against such a risk there should be general and constant protection and the manufacturer is best situated to afford such protection."

■ Substantially the same reasons for imposing strict liability upon sellers of defective chattels have been advanced in several other cases and in various texts and articles.[9] Summarized, the thesis is that a

[9] E. g., Greenman v. Yuba Power Products, Inc., 59 Cal2d 57, 63, 27 Cal Rptr 697, 377 P2d 897 (1963); Goldberg v. Kollsman

loss resulting from the use of defendant's defective goods "is a casualty produced by the hazards of defendant's enterprise, so that the risk of loss is properly a risk of that enterprise,"[9] a view commonly described as the theory of enterprise liability.[10] The theory is a corollary of the broader thesis urged by some writers, particularly Harper and James on Torts, that compensation of the victim rather than fault of the defendant should be the objective in the adjudication of accident cases.[11] The broad proposition is stated by Professor Fleming James, Jr., as follows:

> "* * * Strict liability is to be preferred over a system of liability based on fault wherever you have an enterprise or activity, beneficial to many, which takes a more or less inevitable accident toll of human life and limb. This is true at least where the accident victims are as a class economically ill-equipped to carry the burden of serious accident losses. The impact of such losses on the individual in terms of human hardship is often crushing and

---

Instrument Corp., 12 NY2d 432, 437, 240 NYS2d 592, 191 NE2d 81 (1963); Dickerson, Products Liability and the Food Consumer, ch 5 (1951); 2 Harper and James, Torts, § 28.33, pp. 1605-06 (1956). Cf., Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L J 499 (1961). But see Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L J 1099, 1120-22 (1960).

[9] James, General Products—Should Manufacturers be Liable Without Negligence?, 24 Tenn L Rev 923, 926 (1957).

[10] Ehrenzweig, Negligence Without Fault, 4 (1951); James, General Products—Should Manufacturers be Liable Without Negligence?, 24 Tenn L Rev 923 (1957).

[11] "It is the principal job of tort law today to deal with these [human] losses. They fall initially on people who as a class can ill afford them, and this fact brings great hardship upon the victims themselves and causes unfortunate repercussions to society as a whole. The best and most efficient way to deal with accident loss, therefore, is to assure accident victims of substantial compensation, and to distribute the losses involved over society as a whole or some very large segment of it. Such a basis for administering losses is what we have called social insurance." 2 Harper and James, Law of Torts, § 13.2, pp. 762-63 (1956).

the repercussions of this blow reach far beyond the individual and pose a significant social problem." James, General Products—Should Manufacturers be Liable Without Negligence?, 24 Tenn L Rev 923 (1957).[12]

The rationale of risk spreading and compensating the victim has no special relevancy to cases involving injuries resulting from the use of defective goods. The reasoning would seem to apply not only in cases involving personal injuries arising from the *sale* of defective goods, but equally to any case where an injury results from the risk creating conduct of the seller in any stage of the production and distribution of goods. Thus a manufacturer would be strictly liable even in the absence of fault for an injury to a person struck by one of the manufacturer's trucks being used in transporting his goods to market. It seems to us that the enterprise liability rationale employed in the *Escola* case proves too much and that if adopted would compel us to apply the principle of strict liability in all future cases where the loss could be distributed.[13]

[12] Apparently Professor James does not argue for the imposition of enterprise liability where no accident is involved and the only loss is through loss of use or the cost of repairing the goods. See 2 Harper and James, Torts, § 28.20, p. 1579 (1956). His proposition as stated in the quotation above is further limited to enterprises whose activities take a more or less "inevitable" accident toll. Mr. Justice Traynor's concurring opinion in the *Escola* case takes a similar form. Thus he speaks of the "hazards of life and health" which are "a constant risk and a general one" in defective products that reach the market.

[13] Plant, Strict Liability of Manufacturers for Injuries Caused by Defects in Products—An Opposing View, 24 Tenn L Rev 938, 946 (1957).

Professor James, who favors the adoption of the broader principle by the legislative process, deems it appropriate for the judiciary to employ the theory of enterprise liability in the products cases because it fits within "the framework of our common law tradition," i.e., the law of implied warranties of quality. James, General Products—Should Manufacturers be Liable Without Negligence?, 24 Tenn L Rev 923, 924 (1957).

Although we believe that it is the function of the judiciary to modify the law of torts to fit the changing needs of society, we feel that the judicial extension of the theory of strict liability to all cases where it is convenient for those engaged in commerce to spread the risk would not be advisable. If enterprise liability is to be so extended, there is a strong argument for limiting the victim's measure of recovery to some scheme of compensation similar to that employed in workmen's compensation. The legislature alone has the power to set up such a compensation scheme. The court cannot put a limit upon the jury's verdict.

■ Although we reject the theory of enterprise liability standing alone as a basis for recovery in the so-called products liability cases, this does not mean that a seller not in privity with the plaintiff is never to be held strictly liable for injuries caused by defective goods. We believe that strict liability may be imposed upon the seller in appropriate circumstances through the application of established tort principles directly or by analogy.[9] Thus the seller may be strictly liable for physical harm resulting from the sale of a product which creates an ultrahazardous condition. In such a case the basis for liability is the same as that employed in other cases imposing strict liability, as for

---

[9] The tort liability of the supplier of defective goods is distinct from that imposed under the Uniform Sales Act (ORS Ch 75, repealed effective September 1, 1963) or the Uniform Commercial Code (ORS Ch 71-79). "* * * [T]he liability must clearly be in tort and not in contract, and there is not only no need to borrow a contract term from the law of sales, but it is fraught with trouble when it is employed." Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L J 1099, 1137 (1960). See also Greenman v. Yuba Power Products, Inc., 59 Cal2d 57, 62, 27 Cal Rptr 697, 377 P2d 897 (1963).

example where the harm results from the use of high explosives, or the use of chemicals.[19]

The present case falls within this principle. A defective fuel system which permits the escape of gas fumes into the engine compartment of a boat can be found to create an extrahazardous condition for which the defendant could be held strictly liable. Whether a supplier of a defective product is strictly liable for personal injuries when his conduct is not extrahazardous we need not now decide.

We now consider plaintiff's assignments of error. Plaintiff's first assignment of error is directed at the action of the trial court in sustaining defendant's demurrer to plaintiff's second amended complaint. The demurrer was sustained on the ground that there was an improper joinder of a cause of action for breach of warranty and a cause of action in tort. The complaint contained a count alleging, in effect, a breach of an implied warranty of merchantability and a second count alleging negligence on the part of the defendant.

As we have already explained, a common law action for personal injuries resulting from a defective product based upon an implied warranty of merchantability rests upon the theory of strict liability in tort. Therefore, the court erred in sustaining the demurrer.

---

[19] The reasoning used by this court in holding absolutely liable a user of dynamite, Bedell et ux v. Goulter et al, 199 Or 344, 261 P2d 842 (1953), and an aerial sprayer of defoliant, Loe et ux v. Lenhardt et al, 227 Or 242, 362 P2d 312 (1961), would apply in the case in which a product is manufactured and sold containing a defect that renders it inherently dangerous when used for its intended purpose. See B. F. Goodrich Co. v. Hammond, 269 F2d 501 (10th Cir 1959).

Defendant argues that if there was error in sustaining the defendant's demurrer to plaintiff's second amended complaint, plaintiff waived the error by filing a third amended complaint in which plaintiff deleted the negligence count and stated only a count for a breach of an implied warranty of merchantability. Since the judgment must be reversed on another ground which is discussed below, it is not necessary to decide whether plaintiff waived the error by answering after the demurrer was sustained.

■■ Plaintiff contends that the court erred in giving the following instruction to which exception was made:

> "If you find from the testimony and evidence in this case therefore that the plaintiff failed to give defendant notice of the fact that in his opinion defendant had breached the alleged warranty as set forth in plaintiff's third amended complaint, then and in that event your verdict must be in favor of defendant."

Apparently it was assumed by the trial court that ORS 75.490 was applicable.® The statute is derived from Section 49 of the Uniform Sales Act. The better reasoned cases hold that Section 49 does not apply where the plaintiff who is not in privity with defendant sues

---

® ORS 75.490, which was in effect at the time this action was filed, provided as follows:

> "In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor."

to recover damages for personal injuries.[⑦] We adopt this view. Therefore, the instruction was erroneous.

Defendant contends that if there was error in giving the instruction it was invited by plaintiff. The alleged invitation to err arose out of the following circumstances. Plaintiff's complaint contained an allegation that notice had been given to defendant. Plaintiff offered evidence to prove notice. Defendant objected. In replying to defendant's objection, plaintiff asserted that notice was not necessary under her theory of the case. The trial judge sustained the objection, apparently reasoning that if by plaintiff's own admission notice was not necessary the evidence would be immaterial. Plaintiff then rested and defendant moved for a nonsuit, stating as one ground the absence of evidence of notice. It appears that the trial court deemed notice necessary to plaintiff's cause of action.[⑧] To avoid a nonsuit plaintiff moved to reopen her case for the purpose of proving notice. The motion to re-open was granted and evidence of notice was received over defendant's objection. The court then instructed the jury that notice was necessary.

■■ We find no invitation to err in the foregoing circumstances. The allegation in the complaint that

---

[⑦] Greenman v. Yuba Power Products, Inc., supra. See Deveny v. Rheem Manufacturing Co., 319 F2d 124 (2d Cir 1963) (dictum); 2 Harper and James, Torts, § 28.17, p. 1575 (1956); Prosser, Torts, § 97, p. 679 (3d ed 1964).

[⑧] This appears from the statement made by counsel for plaintiff in connection with a motion to re-open plaintiff's case in chief:

"If the Court please, in view of the Court's remarks on the motion of nonsuit * * * to the effect that the Court was of the opinion that notice of breach of warranty was required to be given by the plaintiff in this case as a condition precedent to a cause of action, the plaintiff at this time moves the Court for permission to re-open her case in chief for the purpose of offering again Exhibit 15 for the limited purpose of establishing the notice that was given."

notice was given does not require plaintiff to prove notice if it is not essential to her cause of action. In such case the allegation is merely surplusage.[9] Plaintiff's motion to re-open her case and the introduction of evidence of notice cannot be regarded as inviting error because it was done in order to avoid a threatened nonsuit.

The instruction may have had the effect of turning the case in defendant's favor. It is possible that the jury concluded that no notice was given but that if it had been given or if it was not necessary to give it plaintiff would have made out her case on the theory of breach of the implied warranty of merchantability.

The judgment is reversed and the cause is remanded for a new trial.

---

[9] Lawrence Warehouse, Inc. v. Best Lumber Co., 202 Or 77, 84, 271 P2d 661, 273 P2d 993 (1954); Lytle v. Payette-Oregon Slope Irr. Dist., 175 Or 276, 152 P2d 934, 156 ALR 895 (1944); Keegan v. Lenzie, 171 Or 194, 135 P2d 717, 721 (1943).