Argued and submitted October 6, 1987, decision of Court of Appeals affirmed in part and reversed in part and judgment of circuit court affirmed March 29, petitions for reconsideration denied May 17, 1988

## SEIBEL,
*Petitioner on Review/*
*Cross-Respondent on Review,*

*v.*

## LIBERTY HOMES, INC.,
*Respondent on Review/*
*Cross-Petitioner on Review.*

(TC 82-1214; CA A38803; SC S34101, S34152)

752 P2d 291

James L. Francesconi, Francesconi & Cash, P.C., Portland,

filed a petition for review and appeared on behalf of petitioner/cross-respondent on review.

G. Kenneth Shiroishi, Dunn, Carney, Allen, Higgins & Tongue, Portland, filed a cross-petition for review and appeared on behalf of respondent/cross-petitioner on review.

LINDE, J.

Peterson, C. J., concurred in part and dissented in part and filed an opinion in which Jones and Gillette, JJ., joined.

## LINDE, J.

Defendant discharged plaintiff from a light duty job that it gave him after he claimed workers' compensation for permanent total disability following an industrial injury. Plaintiff won a jury verdict for damages for breach of an employment contract. On appeal, the Court of Appeals rejected defendant's assertion that there was no evidence of a permanent or "lifetime" employment contract, but the court agreed with defendant that the verdict should be reduced by the amount of social security disability benefits that plaintiff had received and would receive until September 1, 1988, his projected normal retirement date. *Seibel v. Liberty Homes, Inc.,* 85 Or App 261, 736 P2d 578 (1987). Each party petitioned this court to review the ruling adverse to its position. We affirm the ruling that the jury could find breach of a contract of permanent employment, but we reverse the order of remand to offset social security disability benefits.

It would serve little purpose to quote the evidence in detail. Briefly, the disputed terms on which plaintiff was employed emerged from a hearing before a referee considering plaintiff's workers' compensation claim. A determination order had awarded benefits based on 25 percent unscheduled disability from a low-back injury, and plaintiff claimed that he was entitled to permanent total disability benefits.

At the hearing, defendant's production manager testified that defendant had light work available that plaintiff could perform, primarily driving a forklift. When asked whether "this job that's available for Mr. Seibel, at this time, is a permanent job," the manager answered: "as long as we have production to run." When plaintiff, in turn, was asked whether he would take the type of job that the manager described, he answered that if he could work within his limitations and do no heavy lifting, he "would give it a good try." Plaintiff's compensation award eventually was increased to 40 percent disability.

Plaintiff returned to work for defendant on November 27, 1978. Defendant discharged him on January 26, 1979, on grounds that he did not perform assigned tasks and that other workers complained that he delayed production on which their pay was based, and the present action followed.

■     Defendant argued that its production manager's statement "as long as we have production to run" meant that a light duty job would exist, not that it would be promised to plaintiff until he retired. The statement could be so understood. But a jury also could find that plaintiff reasonably understood the statement as an assurance that he could return to employment as long as the work he was able to do was needed. Plaintiff was 55 years old at the time, so an inference that the job would last until plaintiff's normal retirement was not unreasonable. We agree with the Court of Appeals that there was some evidence to support the verdict.

■     Once plaintiff's contract of employment is found to have been breached, however, we do not agree with the court's decision that the amount of the judgment should be reduced by sums that plaintiff later received in social security disability benefits.

Plaintiff applied for disability payments in 1982 and was awarded benefits from and after January 1981. This fact surfaced only late in the trial in a conference in the judge's chambers. The parties disputed whether it should be admitted into evidence, defendant arguing that it was evidence supporting his defense that plaintiff could not do the work, and plaintiff arguing that it was inadmissible evidence of a "collateral source." The court admitted the evidence but instructed the jury not to take it into account in fixing plaintiff's damages, if any; the adjustment would be made by the court. There was no objection to this procedure. After the verdict, however, the court decided that the social security disability benefits should not be deducted from damages and denied defendant's motion to do so.

The remaining issue, therefore, is the purely legal question whether disability benefits under the social security program reduce the liability of an employer who breaches an employment contract. Insofar as there might be an apparent inconsistency between the character of "disability" benefits and the employee's claim that he was able to perform the "light duty" job that he was promised, the jury heard that evidence and decided the issue against the employer.

Whether such payments are to reduce an employer's liability for wrongfully discharging a worker properly depends on the source of the benefits. As a matter only of the common

law of contracts, liability with respect to economic damages would be reduced if the discharged employee finds another job, *see Bramhall v. ICN Medical Laboratories, Inc.,* 284 Or 279, 586 P2d 1113 (1978), Restatement (Second) Contracts § 347 (1979), but statutory benefits often have other characteristics and reflect other policies than the common law of contracts.[1]

The Court of Appeals reduced the employer's liability on the basis of a single precedent, *United Protective Workers v. Ford Motor Co.,* 223 F2d 49 (7th Cir 1955). In that case, an employee's discharge was found to have violated a collective bargaining agreement, and the trial court awarded damages equal to his wages if he had not been discharged. The appellate court observed that if the employer had committed a tort, it could not reduce its liability by any compensation the plaintiff might receive from a third party, but the court thought the rule was otherwise when the discharge was a breach of contract. It explained the distinction on the theory that the tort rule "has a flavor of punitive damages," while in the case before the court, although the employer had breached the contract, "it [was] not a wrongdoer in the tort sense." *Id.* at 54.

Plaintiff attempts to distinguish *United Protective Workers* by drawing a distinction between social security retirement and disability benefits. Unless we were persuaded by that distinction, we might feel constrained to follow *United Protective Workers,* had that decision purported to rest on an interpretation of the Social Security Act. But *United Protective Workers* did not purport to be so based. Rather, the federal court applied what it took to be the common-law contract rule of damages or, more precisely, the federal law of labor agreements under section 301 of the National Labor Relations Act rather than the common law of any state.

We are not persuaded, however, that the effect of payments from a public benefit program on an employer's

---

[1] Defendant also quotes and the Court of Appeals cites *Timberline Equip. v. St. Paul Fire and Mar. Ins.,* 281 Or 639, 646, 576 P2d 1244, 1248 (1978), for the general proposition that "[w]hen a contract is breached the injured party is entitled to receive what he would have if there had been no breach; he is not entitled to receive more." *Timberline* was a dispute about interpretation of a liability insurance policy; the quoted sentence had nothing to do with compensation or any other measure of damages.

liability for a wrongful discharge depends on whether the discharge is wrongful as a breach of contract or for some other reason. That distinction ordinarily has nothing to do with the purposes of such programs. The position urged by defendant and accepted by the Court of Appeals would disregard public compensation in computing damages if the employer wrongfully and tortiously discharges a worker from at-will employment but not if the employer has actually promised the worker a long-term or permanent job.

The distinction finds no support in the policy considerations implicit in public benefit programs such as the social security disability program involved here. Whether the statutory benefit to a discharged worker should reduce the cost to the employer of choosing to breach the employment contract is properly an interpretation of the statutory policy. In fact, statutes rarely address the point explicitly, so that court decisions referring only in general terms to a statutory policy "to alleviate the distress of unemployment," *see Century Papers, Inc. v. Perrino,* 551 SW2d 507 (Tex Civ App 1977) (citing other cases), have been criticized for hiding the "opacity" of legislative purposes behind a "rhetorical flourish." Fleming, *The Collateral Source Rule and Contract Damages,* 71 Calif L Rev 56, 79-80 (1983). But the opacity is not impenetrable.

Social benefit payments to adults before normal retirement age ordinarily are a substitute for income usually earned from some private or public employer. Income from employment is the norm, and support from social funds such as unemployment compensation, disability benefits or welfare is intended as an exceptional replacement. Of course, plaintiff's discharge did not cause his disability, but had he remained employed, as defendant promised, he would not have been eligible for disability benefits. If this replacement income from a public benefit program is subtracted from an employer's liability for wrongfully discharging a worker, the employer may calculate that paying only the difference between the worker's wages and the substituted social benefits is the more profitable choice for the enterprise, but its gain comes at the cost of whoever finances the social program.

Of course, the social program may pay the benefits in any event, whether or not the employer's liability is reduced by the amount of the benefits, if the program either does not

provide for recapturing the benefits or administrators have not moved to do so when the wrongful discharge claim is tried. As between the employee and the agency, this may give rise to a question whether an employee. in plaintiff's situation may end up with more than his due; but that problem can arise in other three-cornered financial relationships. Seen from the perspective of the employer, subtracting benefits paid to a discharged worker from the employer's contractual liability to that extent reduces the employer's incentive to perform its contract and to keep the worker employed rather than on public welfare or other benefits.

We doubt that legislators enacting such programs mean to adopt the theory that it may be economically more efficient to breach an employment contract and pay damages when the cost of such "efficient" breaches falls on a social benefit program. We also doubt that they meant a liability-reducing effect of social benefits to depend on whether the discharge violates a statute, a contractual promise, or tort law. The effect will be inconsistent with the assumptions underlying the replacement income, unless that program is funded only by the employer or there is evidence of a contrary legislative policy.

Social security is funded by payroll taxes on employers and employees. We do not lay down a single rule for all programs. For instance, the Wisconsin Supreme Court let an employer offset unemployment compensation against damages for breach of an employment contract because the employer would ultimately bear the cost through an increased tax rate. *Dehnart v. Waukesha Brewing Co.,* 21 Wis 2d 583, 124 NW2d 664, 671 (1963). *But compare, e.g., Rutzen v. Monroe Cty Long Term Care Program,* 104 Misc 2d 1000, 429 NYS 2d 863, 865-66 (Sup Ct 1980), *quoting Labor Board v. Gullett Gin Co.,* 340 US 361, 364, 71 S Ct 337, 95 L Ed 337 (1951) (no offset for unemployment benefits); *Brown v. A.J. Gerrard Mfg. Co.,* 715 F2d 1549 (11th Cir 1983); *Green Forest Public Schools v. Herrington,* 287 Ark 43, 696 SW2d 714 (1985); *Lambert v. Equinox House, Inc.,* 126 Vt 229, 227 A2d 403 (1967) (same). Moreover, programs differ in the speed and finality of their benefit determinations. Some potential claims may not even have been filed by the time the worker's case against the employer is tried, or a claim may have been accepted at one level only to be later rejected at a higher level,

or it may have been rejected and appealed, or benefits may be redefined or recalculated. These exigencies of social benefit administration should play no role in the employer's liability for wrongfully discharging an employee. A trial of the employee's contract action should not be turned into a trial of the employee's potential claims for benefits from some administrative program, nor should the outcome depend simply on whatever cash benefits happen to have been paid before the trial.

It is argued that to disregard payments of social benefits in the action against the employer gives a successful plaintiff an unjustified windfall. But whether to save or recapture those costs is properly an issue between the provider of the benefits and its beneficiaries, a policy choice in the design of the program. Absence of a recoupment provision does not help the employer who causes the costs by improperly terminating the employee's regular source of compensation. *See Rutzen, supra,* 429 NYS 2d at 866; Note, *Mitigation of Damages by Social Welfare Benefits,* 48 B U L Rev 271, 280-82 (1968).

The Legislative Assembly recently enacted that civil damages for bodily injury or death may be reduced by benefits received from someone other than the party who is to pay the damages, with exceptions that include "(d) Retirement, disability and pension plan benefits, and federal social security benefits." ORS 18.580. The statute does not directly apply, but our holding today is consistent with its policy toward the treatment of benefits replacing economic loss.

For the foregoing reasons, we conclude that the circuit court was right not to reduce plaintiff's damages by the amount of his social security disability benefits.

The decision of the Court of Appeals is affirmed in part and reversed in part, and the judgment of the circuit court is affirmed.

**PETERSON, C. J.,** concurring in part and dissenting in part.

Only by indulging in the most liberal interpretation of the evidence can it be said that there was sufficient evidence from which a jury could find that a contract for lifetime employment existed between the plaintiff and the defendant. Because the plaintiff is entitled to a liberal interpretation of

the evidence, I concur with the majority on this issue. I dissent from the majority's conclusion that social security disability benefits should not be offset.

The issue is whether the plaintiff's award for breach of the employment contract should be reduced by sums that the plaintiff received in social security disability benefits. The plaintiff applied for disability payments in 1982 and was awarded benefits from and after January 1981.

The record shows that at the time of trial the plaintiff was receiving social security benefits for disability under 42 USC § 423(d)(1), which provides:

"The term 'disability' means—

"(A)   inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months * * *."

20 CFR § 404.1505(a) defines "disability" as follows:

"The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, *you must have a severe impairment, which makes you unable to do your previous work or any other substantial gainful activity which exists in the national economy."* (Emphasis added.)

The evaluation of a disability claim is controlled by 20 CFR § 404.1520, which in part provides:

"(a)   *Steps in evaluating disability.* We consider all material facts to determine whether you are disabled. If you are doing substantial gainful activity, we will determine that you are not disabled. * * *.

"(b)   *If you are working.* If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.

"* * * * *

"(e)   *Your impairment(s) must prevent you from doing past relevant work. * * *.*

"(f)   *Your impairment(s) must prevent you from doing any other work. * * *.*" (Emphasis added.)

At trial of the instant case, the social security issue arose in this manner. Near the end of the case, the plaintiff's attorney, in a chambers conference, volunteered that the plaintiff was receiving social security disability benefits. A discussion ensued concerning whether the evidence was admissible. The defendant's attorney asserted that the evidence supported his defense that the plaintiff was unable to work and was admissible. The plaintiff's attorney argued that the evidence was inadmissible "as a collateral source." The court ruled that the evidence would be admitted.

On the question of whether the disability benefits received could be used to reduce the plaintiff's damages, the court instructed the jury:

"Now, you have heard testimony in this case about the plaintiff's Social Security benefits and what he's received therefrom, and what he may receive therefrom. However, now, if you find the plaintiff is entitled to recover, you should determine what his total damages were under the test or measure that I just gave you without any reduction for Social Security benefits received or to be received. The Court will adjust your award to allow for such benefits."[1]

Following the return of the verdict for the plaintiff, the defendant moved the court for an order reducing the damages "by the amount of benefits plaintiff has received in the form of Social Security Disability payments and the amount he will receive in the future of such disability payments." The motion was denied. This appeal followed.

As a general rule, recovery of damages for tortious injury is intended to restore the injured party to the position enjoyed before the injury or to compensate the injured party

---

[1] The better practice would be for the jury to decide all damage questions under appropriate instructions. As the trial court ruefully observed near the end of the case,

"See, you are putting me in a hell of a bind. You are throwing this at me right now. I've got to make a quick decision. I don't like that."

The record suggests that the source of the court's instruction was a handwritten requested instruction by one of the attorneys. (The handwritten requested instruction is not in the trial court file.) In any event, the instruction was given, the procedure described was followed, no objection was made to the procedure and no exception was taken to the instruction.

for the loss. *See, e.g., United Engine Parts v. Reid,* 283 Or 421, 584 P2d 275 (1978). Recovery for breach of contract is intended to put the plaintiff in the position he or she would have been had there been no breach. *See, e.g., Timberline Equip v. St. Paul Fire and Mar. Ins.,* 281 Or 639, 646, 576 P2d 1244 (1978).

This action is for breach of an employment contract. Damages in such cases generally are measured by the accrued wages to the time of trial plus the present value of the total future lost wages for the unexpired term of the employment term, less amounts actually earned in other employment or amounts which could have been earned in other employment by the exercise of reasonable effort. *Bramhall v. ICN Medical Laboratories, Inc.,* 284 Or 279, 286-87, 586 P2d 1113 (1978); 5 Corbin on Contracts 514-18, § 1095 (1964). Under this rule, had the plaintiff obtained other employment, the earnings from that employment would be deducted from the amounts otherwise payable under the contract.

The majority errs in holding that damages for breach of an employment agreement should not be reduced by the amount of social security *disability* benefits received by the plaintiff.

We start with the premise that in an action for breach of contract the plaintiff is entitled to be made whole; he is entitled to be put in as good a position as he would be had the contract been performed. Consistent with this rule, earnings from other employment are deductible from the amount promised to the plaintiff. Whether viewed as an avoidable consequence or as mitigation of damages, that is the rule.

In this case, if no deduction is made from the award, the plaintiff will be made whole and then some, the "then some" being the amount of the social security *disability* benefits.

I am persuaded that an offset should be made for social security disability benefits. If the disability payments are not deducted, the plaintiff will receive a double recovery and will be placed in a better position than had the contract been performed. *See United Protective Workers v. Ford Motor Co.,* 223 F2d 49 (7th Cir 1955). The regulations quoted above make it clear that if the plaintiff had been working for the

defendant, he would not have been entitled to the social security disability benefits.[2] Had the plaintiff, after breach of the contract by the defendant, become disabled and unable to work, he would not have been entitled to receive payment from the defendant after the date of disability.[3]

Even allowing an offset, the plaintiff will be made whole. The plaintiff is put in the position he would have been had the contract been performed. The law's interest in preventing double payment is met, and not unfairly. The law's interest in full compensation is met, and not unfairly.

The collateral source rule, not referred to by name in the majority opinion, is an exception to the general principles that hold that the plaintiff is entitled to be compensated for his or her actual loss and no more. The reasoning is that the defendant, in acting tortiously and causing injury, is a "wrongdoer" and should not reap the benefits of or be credited with money or services *received as a result of the injury from sources other than the wrongdoer. Reinan v. Pacific Motor Trucking Co.,* 270 Or 208, 213, 527 P2d 256 (1974); *Cary v. Burns,* 169 Or 24, 28-29, 127 P2d 126 (1942).

Heretofore this court has applied the collateral source rule only in the tort context. *See e.g. Reinan v. Pacific Motor Trucking Co.,* 270 Or at 213; *Peterson v. State Farm Ins. Co.,* 238 Or 106, 114-15, 393 P2d 651 (1964); *Cary v. Burns, supra.* That is because application in the context of contracts is inconsistent with the rationale for the rule. As stated above, in an action for breach of contract, the law aims to place the party injured by the breach in the position he or she would have been had the other party performed by means of a judgment for money. He or she is not entitled to receive more.

---

[2] I emphasize that this case involves social security *disability* benefits. Whether the same result would apply to social security retirement benefits or unemployment compensation benefits is not involved in this case.

[3] The editors of Restatement (Second) Contracts give this example:

"On April 1, A and B make a personal service contract under which A is to employ B for six months beginning July 1 and B is to work for A during that period. On May 1, B repudiates the contract. On August 1, B falls ill and is unable to perform the contract for the remainder of the period. A can only recover damages based on his loss during the month of July since his loss during subsequent months was not caused by B's breach. * * *"

*Id.,* § 347, *illustration 15* at 117.

*Timberline Equip v. St. Paul Fire and Mar. Ins., supra,* 281 Or at 646; *Selman v. Shirley,* 161 Or 582, 91 P2d 312 (1939).

Note the emphasized language: benefits "received as a result of an injury from sources other than the wrongdoer." In tort cases, the defendant will not be credited for benefits received from other sources *as a result of an injury* from other sources. (This premise is carried into newly enacted ORS 18.580. It uses the phrase "when * * * the party awarded damages * * * *received benefits for the injury* * * * other than from the party who is to pay the damages * * *.") The disability benefits were not received "as a result" of the defendant's breach of contract. The collateral source rule isn't a player in this case.

° The majority states:

"We are not persuaded, however, that the effect of payments from a public benefit program on an employer's liability for a wrongful discharge depends on whether the discharge is wrongful as a breach of contract or for some other reason."

305 Or at 366 (1988). Wrongful conduct is the reason we have previously given for not allowing an offset for other benefits received. Why does the majority depart from that reasoning?

The majority goes on to say that whether the benefit "should reduce the cost to the employer of choosing to breach the employment contract is properly an interpretation of the statutory policy." 305 Or at 367 (1988). If anything is clear from the social security legislation quoted above, it is that a worker should not, at the same time, receive compensation for working and compensation for social security disability benefits.

The majority also opines:

"Seen from the perspective of the employer, subtracting benefits paid to a discharged worker from the employer's contractual liability to that extent reduces the employer's incentive to perform its contract and to keep the worker employed rather than on public welfare or other benefits."

305 Or at 368 (1988). The majority refers to the fact that "it may be economically more efficient to breach an employment contract and pay damages when the cost of such 'efficient' breaches falls on a social benefit program." 305 Or at 368

(1988). Those may be pertinent comments in another case, but they do not apply here.

This is not a case where the employer's breach foisted anything onto the social security disability program. The benefits were not paid because of the breach. Indeed, the possibility of such benefits being paid was not contemplated by the employer.

This is a case in which the integrity of the judicial system should be considered. The plaintiff claimed damages from the defendant on the theory that he was "ready, willing and able to perform the contract." It is clear from the social security regulations that the premise for his receipt of disability benefits is that he was "unable to do any substantial gainful activity." Beyond question, there is an irreconcilable factual and legal inconsistency in these claims.

I suggest that the integrity of the judicial process requires an offset. By not allowing an offset, we are putting our imprimatur, our approval, on assertions that are more than arguably flatly inconsistent. In a very real sense, we are saying, "Plaintiff, you are entitled to social security benefits because you are unable to do any substantial activity; and you are nonetheless entitled to damages from the defendant, even though you could not have performed your contract with the defendant."

One premise for the majority's result in this case is that the breaching employer should not be able to foist onto social security or unemployment compensation the cost of its breach of contract. Whatever validity that premise has, it isn't this case. The opinion encourages conduct that should be discouraged. I have no quarrel with rules of procedure that permit the assertion of inconsistent theories and the presentation of inconsistent facts. But no court should make or approve an *award* that is premised upon inconsistent facts or inconsistent theories of recovery.

The best result is this: We should make the plaintiff whole. Let the plaintiff keep his damage award (which is based upon the premise that he can work), but subtract from that the "damages" he has already received (based on the premise that he can't work). This result is fair, and does no disservice to the policy arguments invoked by the majority.

From our opinions reaching back over twenty years, and most emphatically in the last two years, one must conclude that this court understands the inherent limitations of the judiciary to engage in social engineering. We have said that one should not be tempted to "explain the court's understanding of the existing state of the law by the court's views of desirable social policy." *Norwest Presbyterian Intercommunity Hosp.,* 293 Or 543, 553, 652 P2d 318 (1982). *Accord Donaca v. Curry Co.,* 303 Or 30, 35-6, 36 n 5, 734 P2d 1339 (1987); *Winn v. Gilroy,* 296 Or 718, 728, 681 P2d 776 (1984); *Wights v. Staff Jennings,* 241 Or 301, 310, 405 P2d 624 (1965). That is what the majority does today.

This is not a case of tortious discharge from employment. Two parties disagree on whether there exists a contractual obligation on the part of the defendant to employ the plaintiff under a lifetime contract. The terms of the contract before this court, as stated by the majority, are these: "this job that's available for Mr. Seibel, at this time, is a permanent job" "as long as we have production to run." The plaintiff gave up no right by returning to work. He continued to assert to the Workers' Compensation Board that he was totally disabled. The majority must agree that such terms could leave some doubt in the minds of all concerned that the plaintiff had a lifetime contract. To dispute the existence of such a contract is not some type of "bad faith." I very much doubt that the legal significance of these terms was apparent to anyone (with the possible exception of the plaintiff's attorney) at the time of the workers' compensation hearing.

If the defendant did in fact tortiously discharge the plaintiff or is otherwise guilty of deceit in offering the plaintiff a position that the plaintiff could not handle, then the plaintiff could have brought an action in tort. An attorney often must make decisions concerning the theory of liability to be asserted. Sometimes the tort measure of damages is more favorable than the contract measure. Oftentimes it is easier to prove one theory than another — for example, strict tort liability and negligence. Alternatively, the plaintiff could have argued that the employer acted in bad faith, that in this particular case the breaching party is in that sense a wrongdoer and is not entitled to an offset. These issues are not in the case. The majority should avoid the temptation to fashion a

rule for all times and all purposes to avoid a perceived injustice in this case.

This is not the case to graft a tort measure of damages onto a cause of action for breach of contract. Nor does this case occasion us to examine the theory of efficient breach, the doctrine of bad faith breach, negligent breach or tortious breach, or to reexamine the collateral source rule in tort cases.[4] It is a straightforward claim for breach of contract.

Jones and Gillette, JJ., join in this opinion.

---

[4] *See* The Economics of Contract Law (A. Kronman & R. Posner eds 1979); Barton, *The Economic Basis of Damages for Breach of Contract,* 1 J Legal Stud 277 (1972); Shavell, *Damage Measures for Breach of Contract,* 11 Bell J Econ 466 (1980); Note, *Tort Remedies for Breach of Contract: The Expansion of Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Into the Commercial Realm,* 86 Colum L Rev 377 (1986); Note, *Damage Measurements for Bad Faith Breach of Contract: An Economic Analysis,* 39 Stan L Rev 161 (1986).

On the collateral source rule in contract cases, see Fleming, *The Collateral Source Rule and Contract Damages,* 71 Cal L Rev 56 (1983).

On mitigation of damages by social welfare benefits, see *Fleming, supra;* Note, *Mitigation of Damages by Social Welfare Benefits,* 48 B U L Rev 271 (1968).