Argued and submitted January 13, decision of Court of Appeals and judgment of circuit court affirmed October 15, 2009

George WHITE,
*Respondent on Review,*

*v.*

JUBITZ CORPORATION,
an Oregon corporation,
dba Ponderosa Lounge,
*Petitioner on Review.*

(CC 040302468SC; CA A128617; S056015)

219 P3d 566

Michael T. Stone, Brisbee & Stockton LLC, Hillsboro, argued the cause and filed the briefs for petitioner on review.

Mark G. McDougal, Portland, argued the cause and filed the brief for respondent on review. With him on the brief was Gregory Kafoury.

C. Robert Steringer, Portland, filed a brief for *amicus curiae* Oregon Association of Defense Counsel.

Barry J. Goehler, Portland, filed a brief for *amicus curiae* Donald McGee. With him on the brief was Michael A. Lehner.

Charles Robinowitz, Portland, filed a brief for *amicus curiae* Oregon Trial Lawyers' Association. With him on the brief was Maureen Leonard.

WALTERS, J.

Kistler, J., dissented and filed an opinion in which Balmer, J., joined.

## WALTERS, J.

Plaintiff walked into a bar. He was injured when the stool he sat on collapsed beneath him and he sued defendant, the bar owner and operator, for the injuries that he incurred. A jury awarded plaintiff $37,600 in economic damages, approximately the amount that plaintiff's medical providers had billed him for their services. Plaintiff was over 65 years old and, pursuant to the federal Social Security Act, qualified for Medicare benefits. 42 USC §§ 1395 - 1395hhh. In accordance with that federal law and the applicable formula for determining permitted payments, Medicare had paid plaintiff's medical providers a total of $13,400. Also in accordance with that law, the providers had accepted that sum as payment in full for their services and had "written off" the remainder of their charges. The question that this case presents is whether plaintiff may recover from defendant the total amount of the medical providers' reasonable charges or whether his recovery must be limited to the amount that Medicare paid to those providers. Both the trial court and the Court of Appeals ruled that plaintiff is entitled to recover the full amount of his judgment. For the reasons that follow, we affirm.

Alleging negligence on the part of defendant for failure to inspect and maintain the bar stool, plaintiff commenced a tort action, seeking as economic damages the total amount that his healthcare providers had billed him, as well as noneconomic damages.[1] Before trial, defendant moved to limit plaintiff's economic damages to "what was paid." Defendant argued that, under ORS 31.710(2)(a), the medical providers' "write-offs" were not "economic damages" that plaintiff had "necessarily incurred."[2] Defendant contended that

---

[1] In addition to the amount that medical providers had billed him ($38,977), plaintiff sought economic damages for future medical expenses. Plaintiff's claim for future medical expenses has no bearing on the issues presented on review.

[2] ORS 31.710(2) provides, in part:

"As used in this section:

"(a) 'Economic damages' means objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for

"Medicare paid $13,000, and that was what was incurred. * * * [The amount 'written off'] wasn't paid to the doctors. The doctors have no claim for that money that wasn't paid to them. They accepted the money from Medicare, and the plaintiff has no obligation to reimburse Medicare any other money than what they paid."

In the alternative, defendant argued that, to establish "the reasonable amount, * * * the market value" of the medical treatment that plaintiff had received, defendant should be permitted to present to the jury evidence of the amount that Medicare had paid for that treatment.

The trial court ruled that "the jury [wa]s not going to hear any reference to * * * Medicare[,]" and that plaintiff was entitled to claim the entire amount of the bills that he had received. However, the court granted defendant leave to file a post-verdict motion, under Oregon's collateral source statute, ORS 31.580, to reduce the jury award, "if it bec[ame] necessary."[3] At trial, plaintiff offered the medical bills that he had received as evidence of his reasonable medical expenses.

substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less."

ORS 31.710 originally was enacted as *former* ORS 18.560 and was renumbered in 2003 without substantive changes. We refer to it by its current number.

[3] ORS 31.580 provides:

"(1) In a civil action, when a party is awarded damages for bodily injury or death of a person which are to be paid by another party to the action, and the party awarded damages or person injured or deceased received benefits for the injury or death other than from the party who is to pay the damages, the court may deduct from the amount of damages awarded, before the entry of a judgment, the total amount of those collateral benefits other than:

"(a) Benefits which the party awarded damages, the person injured or that person's estate is obligated to repay;

"(b) Life insurance or other death benefits;

"(c) Insurance benefits for which the person injured or deceased or members of that person's family paid premiums; and

"(d) Retirement, disability and pension plan benefits, and federal Social Security benefits.

"(2) Evidence of the benefit described in subsection (1) of this section and the cost of obtaining it is not admissible at trial, but shall be received by the court by affidavit submitted after the verdict by any party to the action."

ORS 31.580 originally was enacted as *former* ORS 18.580 and was renumbered in 2003 without substantive changes. We refer to that statute by its current number.

Without waiving its pretrial legal arguments, defendant stipulated that those charges were both reasonable and necessary.

The jury found for plaintiff, awarding him $37,600 for economic damages and $100,000 for noneconomic damages. In a post-verdict motion, defendant requested "that the portion of the medical bills which were written-off be deducted from the amount of the verdict." As it had argued in its motion *in limine*, defendant asserted that plaintiff had not "necessarily incurred" those charges. As a consequence, defendant further argued, the jury verdict granted plaintiff a "double recovery" to which he was not entitled and that the collateral source statute, ORS 31.580, had been designed to prevent.

In a written order, the trial court noted, as an undisputed fact, that plaintiff contractually had agreed to pay the full amount that his providers billed him.[4] The court concluded that the satisfaction of those obligations by Medicare through payment and provider "write-offs" were "federal Social Security benefits" that ORS 31.580(1)(d) precluded the court from deducting. The trial court therefore denied defendant's motion and entered judgment for plaintiff in the full amount of the jury verdict.

Defendant timely appealed to the Court of Appeals, renewing the arguments that it had made to the trial court in its pretrial and post-verdict motions. In a written opinion, that court affirmed the judgment of the trial court. *White v. Jubitz Corp.*, 219 Or App 62, 182 P3d 215 (2008). The Court of Appeals applied the definition of economic damages found in ORS 31.710(2)(a) and held that " 'reasonable charges necessarily incurred' * * * are those charges to which a plaintiff becomes liable or subject when the plaintiff receive[s] treatment, without regard to amounts that a medical provider

---

[4] One agreement that plaintiff signed provided that, in consideration for medical treatment, plaintiff was obligated "to pay the account of [the provider] in accordance with its regular rates and terms." In a separate, signed agreement with another provider, plaintiff acknowledged that, "you (or the responsible party in the case of a minor) are responsible for payment of your bill even if not covered in full or in part by your insurance." While the terms of the agreements with other providers do not appear in the record, defendant did not contest plaintiff's contractual obligation to pay the full amount that his providers had billed him.

subsequently writes off." *Id.* at 70. The court also agreed with the trial court that the providers' "write-offs," as well as their Medicare payments, fell into the category of "federal Social Security benefits" that the trial court could not deduct. *Id.* at 76.

We granted defendant's petition for review. In this court, defendant assigns as error three rulings of the trial court, each of which challenges plaintiff's recovery of the medical expenses that his providers billed to him that exceeded the amounts that Medicare paid those providers. Defendant asserts that the trial court erred in (1) refusing to deduct those amounts from plaintiff's jury verdict; (2) allowing plaintiff to seek a jury award of those amounts; and (3) denying defendant's request to adduce evidence of those amounts.

Before we begin our analysis of defendant's legal arguments, it is important that we distinguish them from a factual argument that defendant does not make here and did not make below. Defendant does not contend that the total charges that the medical providers billed to plaintiff were excessive, inflated, or unreasonable. Nothing in this record suggests that, had plaintiff not been an eligible Medicare beneficiary, defendant would have contested plaintiff's right to recover those charges. Indeed, defendant stipulated at trial that, as a factual matter, the providers' charges were both reasonable and necessary. The arguments that defendant advances instead challenge plaintiff's right, as a Medicare beneficiary, to recover those expenses, thereby, in defendant's view, wrongfully granting plaintiff a "windfall" or "double recovery."

For reasons that we explain, the collateral source statute, ORS 31.580, compels our conclusion that the trial court and the Court of Appeals ruled correctly. However, because it assists in an understanding of that statute and each of defendant's legal arguments, we begin our analysis with a discussion of the common-law collateral source rule and the "double recovery" that it countenances. We then describe ORS 31.580 and analyze how it affects each of defendant's legal arguments.

## I. THE COMMON-LAW COLLATERAL SOURCE RULE

Whenever a plaintiff seeks from a defendant a sum that the plaintiff also is entitled to recover from a third party, the specter of "double recovery" is presented. In 1942, this court first considered how to address such circumstances and adopted what came to be known as the "collateral source rule." In *Cary v. Burris*, 169 Or 24, 127 P2d 126 (1942), the plaintiff, a federal employee injured in the performance of official duties, was entitled to the benefits of a federal law that required the government to provide him with medical and hospital services either by furnishing him with government physicians and hospitals, or if impracticable, by paying for commensurate private services. When the plaintiff, who had received the benefits of that government program, also sought to recover medical expenses from the tortfeasor who caused his injuries, the trial court prohibited the jury from making such an award. *Id.* at 26. This court held that, although the "benefits of the United States Government compensation act," *id.* at 25, were provided to the plaintiff as a "mere gratuity," *id.* at 28, those benefits did not preclude the plaintiff from recovering the full amount of his special damages from the defendant, *id.* at 29. The court quoted 1 *Sedgwick on Damages* § 67 (9th ed 1912), for the following proposition:

> "Damages cannot be reduced by an amount which the plaintiff may have received from third parties, acting independently of the defendant, though it is given to the plaintiff on account of the injury. For it is given either as a pure gift, not intended by the giver to be in lieu of damages, or else it is given in performance of a contract, the consideration of which was furnished by the plaintiff. In neither case has the defendant any equitable or legal claim to share in the benefit."

*Id.* at 28 (internal quotation marks omitted).

The court also quoted 1 *Sutherland on Damages* § 158 (3d ed 1903), for the principle that:

> "Generally there can be no abatement of damages on the principle of partial compensation received for the injury where it comes from a collateral source, wholly independent of the defendant, and is as to him *res inter alios acta*. * * *

> [N]or does the gratuitous care and nursing of an injured plaintiff relieve the party who caused the injury from liability for their worth."

*Id.* at 28-29 (internal quotation marks omitted).

In 1974, in considering the evidentiary ramifications of the collateral source rule, this court declared:

> "The salutary policy underlying the collateral source rule is simply that if an injured party received some compensation from a source wholly independent of the tortfeasor, such compensation should not be deducted from what he might otherwise recover from the tortfeasor."

*Reinan v. Pacific Motor Trucking Co.*, 270 Or 208, 213, 527 P2d 256 (1974).

The term "double recovery" implies that a plaintiff has received and will retain the same remuneration from two outside sources—the defendant and a third-party benefit provider—to compensate for a single harm. However, rarely will that assumption prove entirely accurate. A plaintiff who receives life or medical insurance benefits from a third-party provider generally will have paid premiums for those benefits or will have earned them as compensation for employment. Similarly, a plaintiff who receives retirement benefits, whether from a private corporation or a government program, generally will have earned or invested those funds. In addition, there are many instances in which the third-party benefit provider retains a right of subrogation for any tort award that beneficiaries recover. As a result, the collateral benefits paid by a third party may only reimburse the plaintiff for his or her prior labor or investment or may be returned to that third party. *See, e.g.*, ORS 742.538 (providing insurers with right to subrogate insured's proceeds in tort actions); William M. Landes and Richard A. Posner, *The Economic Structure of Tort Law* 252 (1987) (noting that plaintiff who recovers insurance benefits and damages from defendant does not receive double recovery because "the plaintiff paid for the benefit in his insurance premium").

The common-law collateral source rule does not concern itself with whether a plaintiff actually obtains a "double recovery." The rule permits a plaintiff to recover damages

from a tortfeasor and concomitant sums from a third party and to do so without regard to whether the plaintiff has purchased, earned, or must repay those third-party benefits. In *Peterson v. State Farm Ins. Co.*, 238 Or 106, 393 P2d 651 (1964), this court recognized that plaintiffs who were injured by insured motorists could recover damages from those tortfeasors and also could recover third-party workers' compensation benefits. By the terms of the workers' compensation statute then in existence, injured plaintiffs could retain 40 percent of the duplicate payments. Therefore, the court concluded, plaintiffs who were entitled to statutory uninsured motorists' benefits also were entitled to the same "double recovery." *Id.* at 112-15. The court held that, "in the absence of a statutory provision to the contrary, the policy in Oregon under the common law is to allow such recoveries." *Id.* at 115.

In the context of a claim for contractual damages, this court has explained that whether a plaintiff who recovers from a tortfeasor and also from a third party is entitled to retain both sets of benefits depends, just as it did in *Peterson*, on the relationship between the plaintiff and the third-party provider and on the law that governs that relationship:

> "It is argued that to disregard payments of social benefits in the action against the employer gives a successful plaintiff an unjustified windfall. But whether to save or recapture those costs *is properly an issue between the provider of the benefits and its beneficiaries, a policy choice in the design of the program.*"

*Seibel v. Liberty Homes, Inc.*, 305 Or 362, 369, 752 P2d 291 (1988) (emphasis added). *See also Dickson v. Hollinger*, 262 Or 113, 115 n 1, 496 P2d 912 (1972) (noting that legislature addressed criticism of collateral source rule by providing insurers with reimbursement and subrogation rights).

Therefore, under the common-law collateral source rule, the extent of a tortfeasor's liability to a plaintiff is not determined by the vagaries of whether the plaintiff has purchased life or medical insurance, is eligible for employment or governmental life, medical, disability or retirement benefits, or by the terms of such insurance or benefits. Tortfeasors that

cause the same injuries are responsible for the same damages, irrespective of the plaintiffs' receipt of benefits from, or legal relationships with, third-party benefit providers.

## II. THE COLLATERAL SOURCE STATUTE, ORS 31.580

■ In this case, defendant acknowledges that the common law has permitted the recovery that we have described. However, defendant asserts, when the legislature adopted ORS 31.580 as a component of the comprehensive tort law revisions that it enacted in 1987, that body intended to change the common-law collateral source rule to preclude "double recovery." We agree that ORS 31.580 modified the common-law collateral source rule and that it now provides the controlling law in actions for damages for bodily injury or death. We disagree, however, that ORS 31.580 prohibits double recovery. ORS 31.580(1) provides:

"In a civil action, when a party is awarded damages for bodily injury or death of a person which are to be paid by another party to the action, and the party awarded damages or person injured or deceased received benefits for the injury or death other than from the party who is to pay the damages, the court may deduct from the amount of damages awarded, before the entry of a judgment, the total amount of those collateral benefits other than:

"(a) Benefits which the party awarded damages, the person injured or that person's estate is obligated to repay;

"(b) Life insurance or other death benefits;

"(c) Insurance benefits for which the person injured or deceased or members of that person's family paid premiums; and

"(d) Retirement, disability and pension plan benefits, and federal Social Security benefits."

By its terms, ORS 31.580 applies only to civil actions where a party is awarded damages for bodily injury or death. In those actions, subsection (1) permits, but does not require, a trial court to deduct from a plaintiff's award of damages those benefits that a plaintiff receives from a third party. Paragraphs (a) through (d) limit the circumstances in which a court may exercise its discretion to do so. Those paragraphs preclude a trial court from deducting four sets of benefits;

paragraph (a) exempts from deduction those benefits that a plaintiff has an obligation to repay; paragraphs (b) through (d) exempt from deduction other specified benefits such as private and governmental insurance and retirement benefits, but do so without regard to whether a plaintiff has an obligation to repay those benefits, and paragraph (d) specifically precludes trial courts from deducting "federal Social Security benefits" from a plaintiff's damages award.

Instead of relying on the text of ORS 31.580 to support its position, defendant requests that we look to its legislative history to discern "that the legislature sought to eliminate any double recovery by plaintiff in the application of the collateral source rule." Although we will consider the legislative history of ORS 31.580, we emphasize that that legislative history cannot substitute for, or contradict the text of, that statute.

> "[A] party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it. Legislative history may be used to confirm seemingly plain meaning and even to illuminate it; a party also may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute. For those or similar purposes, whether the court will conclude that the *particular* legislative history on which a party relies is of assistance in determining legislative intent will depend on the substance and probative quality of the legislative history itself. We emphasize again that ORS 174.020 obligates the court to consider proffered legislative history only for whatever it is worth—and what it is worth is for the court to decide. When the text of a statute is truly capable of only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different."

*State v. Gaines*, 346 Or 160, 172-73, 206 P3d 1042 (2009) (footnotes omitted; emphasis in original).

Rather than disclose a latent ambiguity in its text, the legislative history of ORS 31.580 confirms our conclusion that, in enacting that statute, the legislature did not preclude "double recovery" of collateral source benefits. When the

Senate Judiciary Committee considered the collateral source rule in 1987, it framed the policy choice as follows:

> "The policy question here is: Should the defendant get the benefit of the plaintiff's planning and coverage from another source or should the plaintiff recover twice for some of his or her damages * * *?"

Staff Measure Analysis, Senate Committee on Judiciary, Senate Bill (SB) 323, Feb 11, 1987, Ex G (memorandum prepared by Karsten Rasmussen) (hereinafter Staff Analysis). Some legislators sought to answer that question by *requiring* the trial court to deduct collateral benefits from a plaintiff's verdict *except* in circumstances in which the plaintiff would be required to repay the benefits or had purchased, earned, or invested toward the benefits. Those legislators introduced Senate Bill (SB) 323 (1987), which provided, in part:

> "Section 13. (1) When in a civil action a party is awarded damages for bodily injury or death of a person to be paid by another party to the action, and the party awarded damages or person injured or deceased received benefits for the injury or death other than from the party who is to pay the damages, *the court shall deduct* from the amount of damages awarded, before the entry of final judgment, the total amount of those collateral benefits *other than*:
>
> "(a) Benefits the party awarded damages, the person injured or that person's estate is obligated to repay;
>
> "(b) Life insurance or other death benefits;
>
> "(c) Insurance benefits for which the person injured or deceased or members of that person's family paid premiums; and
>
> "(d) Retirement, disability or pension plan benefits."

(Emphases added.) In the work sessions where that bill was discussed, members of the committee expressed a desire to prevent a plaintiff from recovering twice for the same injury; members, however, stressed the need that "all economic issues [be] brought in"—*i.e.*, including what the injured party had paid for the collateral damages in premiums, or what the injured party had earned through employment. *See* Minutes, Senate Committee on Judiciary, SB 323, Mar 3, 1987, 5-6

(Senators Wyers, Cohen, and Brockman, and Chairman Frye expressing agreement that statute should be written to "prevent true double recovery"). Senator Brockman argued that the exceptions essentially neutered that section of the bill. He advocated replacing Section 13 with Senate Bill (SB) 347 (1987), which contained wording similar to subsection 13(1) ("the amount * * * shall be deducted by the court"), but without any exceptions. *Id.*

The committee then heard testimony and received exhibits demonstrating that, in many cases, double recovery had been addressed by agreements or law that governed the relationships between plaintiffs and the third-party benefit providers. For instance, witnesses noted, subrogation clauses in insurance agreements and government benefit schemes reduced the instances of double recovery. *See* Staff Analysis (noting that there were few instances of actual double recovery); Testimony, Senate Committee on Judiciary, SB 323, Jan 27, 1987, Ex C (statement of Professor Dominick Vetri) (collateral source rule becoming "less and less significant" because of subrogation). A judiciary committee staff member advised the committee that "passage of legislation which requires that collateral benefits be deducted from the verdict[ ] may either eliminate subrogation or penalize the injured party." Staff Memorandum, Senate Committee on Judiciary, SB 323, Mar 17, 1987, Ex G (Memorandum Regarding Collateral Benefits prepared by Eric Carlson).

After considering that and other testimony, the committee voted to remove Section 13 from the bill. Minutes, Senate Committee on Judiciary, SB 323, Mar 19, 1987, 20 (motion to delete Section 13 passed over votes of no from Senators Brenneman, Brockman, and Hamby). The effect of Section 13's removal would have been to leave the issue of collateral benefits to the existing common law that permitted "double recovery."

SB 323 then went to the House of Representatives. The House reinserted, as Section 9 of the bill, a provision that authorized, but did not require, a court to deduct collateral benefits received by a plaintiff, except those benefits that a plaintiff had an obligation to repay. Section 9 provided, in part:

> "In any action arising out of bodily injury * * *, in the event that the injured party * * * has received benefit from a collateral source *for which there is not an obligation to repay,* the amount or value thereof *may* be deducted by the court from any verdict or award in [the] plaintiff's favor prior to the entry of final judgment. Before making the deduction, the court shall determine the cost to [the] plaintiff or [the] plaintiff's estate of obtaining such benefit and shall credit the cost against the amount of the benefit to be deducted from the judgment."

House Amendments to C-Engrossed SB 323 (emphases added). The House Committee on Judiciary discussed the policy implications of the proposed House amendment and noted that the use of the word "may" would grant a court discretion to consider the collateral benefits that a plaintiff had received but did not have an obligation to repay. The permissive term would authorize a court to reduce a tort verdict by the amount of those benefits, less the cost of obtaining them, when necessary to prevent an unjust result. Minutes, House Committee on Judiciary, SB 323, June 6, 1987, 21. Representative Bunn argued in favor of replacing the discretionary "may" with a mandatory "shall." In advocating for that position, he articulated the same concern about a plaintiff's potential "windfall" that lies at the heart of defendant's argument in this case. He urged the committee that

> "the basic concept [of the collateral source revision] says that if you are being paid from some other source that you didn't have to pay for, we're not going to have the court award a judgment paying you a second time. If you got a judgment for $100,000 of costs and you got $50,000 of costs from some other source that you didn't have to pay for then we'll reduce the judgment by $50,000 so that you don't get a surplus. * * *.

> "If we use the word 'may' that will destroy the section. It will not provide a meaningful collateral source [statute]."

Tape Recording, House Committee on Judiciary, SB 323, June 6, 1987, Tape 733 (statement of Representative Bunn). In response, Representative Dix asserted that "[t]he compromise that was worked out was 'may,' " giving a judge discretion to reduce verdicts in certain situations and that that compromise "[wa]s an important ingredient in the overall

package." *Id.* (statement of Representative Dix). Representative Bunn subsequently moved to replace the word "may" with the word "shall" and that motion was defeated with all other members on the committee voting against the change. *Id.*

The final House version of the bill also contained the four categories of benefits that the current version of ORS 31.580 exempts from judicial reduction, regardless whether a plaintiff stands to receive a double recovery. Thus, the legislature answered the policy question posed at the outset of its deliberations by deciding that, for those listed categories of third-party benefits, the plaintiff always should receive the benefit of his or her planning and investment and should not be prevented from recovering twice. For other, unlisted, benefits, a trial court should have discretion to consider the plaintiff's planning and investment and answer the question posed based on the particular facts presented.

■ ORS 31.580 applies to this action for damages for bodily injury. We turn therefore to an examination of how that statute treats the collateral benefits at issue in this case.

The collateral benefits that plaintiff received and that are at issue here are Medicare benefits. Medicare is a federally funded and administered medical insurance program for the elderly and disabled. 42 USC §§ 1395 - 1395hhh. Congress established Medicare as Title XVIII of the 1965 Social Security Act. Medicare provides individuals with varying degrees of coverage for different types of medical care. Part A of the Medicare program covers hospital stays. Beneficiaries generally fund the benefits that they receive under Medicare Part A by paying payroll taxes. 42 USC § 1395i(a). If beneficiaries have not worked a sufficient period of time to be eligible for Medicare Part A, then they may qualify for those benefits by paying premiums. *Id.* § 1395i-2a(d). Part B of the Medicare program provides "medical and other health services," including "physicians' services," medically necessary outpatient procedures, and preventative care. *Id.* § 1395x(s). Beneficiaries fund the benefits they receive under Medicare Part B by paying monthly premiums and a yearly deductible. *Id.* §§ 1395j-l.[5]

---

[5] Additionally, Medicare, under Part C, provides for health plan options approved by Medicare and offered by private companies. Under Part C, Medicare

The Medicare provisions of the Social Security Act assure beneficiaries that, except for deductibles and copays, they will not be required to pay for covered medical expenses. The Medicare provisions achieve that result in the following ways.[6]

With respect to the services provided under part A of the Social Security Act, beneficiaries are entitled to have Medicare make payments "on [their] behalf." *Id.* § 1395d(a). Medicare makes those payments directly to providers of hospital services. *Id.* § 1395g. Providers of hospital services must sign an agreement with Medicare not to charge beneficiaries for services for which beneficiaries are entitled to have payment made by Medicare. *Id.* § 1395cc(A)(1).

With respect to services provided under Part B of the Social Security Act, Medicare beneficiaries are entitled to have Medicare make payments "to [them] or on [their] behalf." *Id.* § 1395k(a)(1). There are two types of physicians under Part B—participating physicians and nonparticipating physicians. Participating physicians make an annual election to accept assignment of Medicare claims from Medicare beneficiaries. Nonparticipating physicians do not make an annual election to accept assignment, but may do so on a case-by-case basis.[7] Medicare pays an assigning physician directly, and assigning physicians agree to accept payment from Medicare as payment in full for their services. *Id.* § 1395u(b)(3)(B)(ii)(I).

If a nonparticipating physician does not accept assignment from a Medicare eligible patient, then Medicare will pay the patient, not the physician. *Id.* § 1395u(b)(6). In that instance, the Social Security Act prohibits the physician

pays to those private companies, a fixed monthly amount on the participating beneficiary's behalf. 42 USC §§ 1395w-21 - 1395w-29. Part D of Medicare consists of a voluntary prescription drug benefit program. *Id.* §§ 1395w-101 - 1395w-152. Parts C and D of the Medicare program are not at issue in this case.

[6] Plaintiff in this case may have had an obligation to pay deductibles, copays, or expenses not covered by Medicare, but those obligations are not at issue here. *See* 42 USC § 1395e (describing deductibles and copayments under Part A); § 1395l(a), (b) (describing deductibles and copayments under Part B).

[7] In many instances, nonparticipating physicians must bill on an assignment basis. *See, e.g.,* 42 USC § 1395w-4(g)(3) (requiring physicians who treat patients eligible for Medicaid to accept assignment).

from billing or collecting from the patient an amount that exceeds a statutorily defined "limiting charge." 42 USC § 1395w-4(g)(1)(A)(i).[8]

In this case, plaintiff's medical providers billed him $38,977 for their services. If plaintiff had not qualified for Medicare benefits, then he would have been liable for the entire amount that the providers had billed him. Instead, Medicare satisfied those bills by requiring that those providers accept Medicare payments of $13,400 as payment in full for their services. Defendant accepts that the amounts that Medicare actually paid his medical providers are exempt from deduction under ORS 31.580(1)(a), which exempts benefits that the plaintiff, the injured party, or that person's estate "is obligated to repay." As defendant states it:

> "Whether they are considered social security benefits, insurance benefits, or some other type of benefit, medical bill payments actually made by Medicare and for which Medicare *has a right to reimbursement* are clearly, under ORS 31.580(1)(a), a collateral source that may not be deducted from the judgment."

(Emphasis in original omitted; emphasis added.) Defendant argues, however, that, because plaintiff does not have an *obligation to reimburse Medicare* for the "write-offs" that the Social Security Act requires, ORS 31.580(1)(a) does not apply to those "write-offs" and does not preclude their deduction.[9]

---

[8] Because Medicare does not pay physicians who do not accept assignment directly, and because those physicians are prohibited from billing patients more than the statutorily defined "limiting charge," and because it appears from the bills in the record in this case that Medicare paid plaintiff's physicians directly and that those physicians charged plaintiff more than a "limiting charge," we believe, although we cannot be certain, that all of plaintiff's physicians accepted assignment. Supporting that inference in this case is the fact that plaintiff's medical bills indicate that he received Medicaid in addition to Medicare benefits, and physicians who treat patients eligible for Medicaid must accept assignment. 42 USC § 1395w-4(g)(3).

[9] Defendant cites 42 USC § 2651 as authority for its conclusion that Medicare has a right to require plaintiff to reimburse it for the amounts that it actually paid on plaintiff's behalf. That statute provides that the United States has a right to sue a tortfeasor for the reasonable value of medical care that it is authorized or required by law to furnish or pay for, or gives the United States the right to be subrogated to any claim that the injured person has or to require the injured person to assign his or her claim or cause of action to the United States. That statute is not specific to Medicare and defendant does not cite any cases indicating that it has been used to require reimbursement by Medicare recipients. Defendant also did

However, as we have explained, if Medicare benefits fall into one of the categories set forth in ORS 31.580(1)(b), (c), or (d), then the trial court was precluded from reducing plaintiff's verdict by the amount of those benefits without regard to whether plaintiff had an obligation to repay them.

One of those paragraphs, ORS 31.580(1)(d), specifically exempts "federal Social Security benefits" from deduction, and Medicare benefits are, as defendant acknowledges, benefits "established as part of the Social Security Act." The Court of Appeals conducted a detailed analysis of the text of ORS 31.580(1)(d) and decided that that provision is not limited to Social Security retirement benefits but encompasses the benefits provided by all Social Security programs, including Medicare. *White*, 219 Or App at 74-75. In this court, defendant does not contend that the Court of Appeals erred in its analysis. Defendant instead points to similar statutes in other states that specifically mention Medicare benefits and argues that the lack of specificity in ORS 31.580(1)(d) makes that text ambiguous. Defendant then cites to legislative history that indicates that one legislator believed that Medicare and Medicaid payments would be treated as health insurance benefits under ORS 31.580(1)(c). Minutes, House Committee on Judiciary, SB 323, June 6, 1987, 21.

Neither defendant's citation to other state statutes nor the legislative history of ORS 31.580 convinces us that paragraph (d) of that statute is ambiguous. For the reasons explained by the Court of Appeals, we think that the term "federal Social Security benefits" is comprehensive and includes Medicare benefits.

If plaintiff had not been an eligible Medicare beneficiary, then he would have been entitled to recover and retain the jury award of $37,600, the reasonable medical expenses that plaintiff's providers had charged to him. Under ORS 31.580, plaintiff's status as a Medicare beneficiary and his receipt of Medicare benefits do not permit a different result.

---

not establish that plaintiff in this case assigned his claim or cause of action to the United States government or that the government asserted a right to subrogation. Because defendant does not contest its liability for the sums paid by Medicare, and because we decide that all Social Security benefits are exempt from reduction under ORS 31.580(1)(d), we need not decide whether plaintiff had an obligation to repay Medicare for the sums that it paid his medical providers on his behalf.

The legislature precluded the trial court from making any deduction from the jury verdict for "Social Security benefits." In doing so, the legislature did not indicate an intent to distinguish between the payments that Medicare makes and the requirement that it imposes on medical providers to accept those payments in satisfaction of their charges; the legislature exempted from judicial deduction Social Security "benefits"; it did not exempt Social Security "payments." Thus, the trial court in this case was correct to deny defendant's post-trial motion under ORS 31.580 to reduce the jury's award of medical expenses.

## III. RECOVERABLE DAMAGES AND ORS 31.710

Defendant's next argument, to which we now turn, is that plaintiff was not entitled to claim as economic damages amounts that he did not pay or have a legal obligation to pay. For the reasons that we explain, examining defendant's objection to plaintiff's "double recovery" through the lens of the damages that a plaintiff is permitted to claim, rather than those damages that a plaintiff may recover, does not lead us to a different conclusion.

In support of its argument, defendant cites the definition of "economic damages" found in ORS 31.710. That statute provides, in part:

"(1) Except for claims subject to ORS 30.260 to 30.300 and ORS chapter 656, in any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000.

"(2) As used in this section:

"(a) '*Economic damages*' means objectively verifiable *monetary losses* including but not limited to reasonable charges *necessarily incurred* for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily

incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less."

(Emphases added.)

Defendant cites the dictionary definitions of "monetary" and "loss" for the proposition that, to suffer monetary loss, a plaintiff must "unintentionally part with money."[10] Defendant cites the dictionary definition of "incurred" for the proposition that, to "incur" a charge, a plaintiff must "become liable or subject to" it.[11] We understand defendant's argument with respect to those definitions to be that, because plaintiff did not pay or have an obligation to pay the charges that his medical providers billed to him but later "wrote off," plaintiff did not suffer "monetary loss" with respect to those charges, nor did he "incur" them.

The first problem with that argument is that ORS 31.710(2) does not define or limit the compensatory damages that a plaintiff may recover. ORS 31.710(2) introduces the definition of "economic damages" with the phrase "as used in this section" and therefore defines "economic damages" for the purposes of ORS 31.710. ORS 31.710(1) indicates that the purpose of that statute is to describe the damages that are subject to a statutory cap (noneconomic damages) and those that are exempt from that cap (economic damages). Because this case does not present an issue relating to the statutory cap, the definition in ORS 31.710 is not directly applicable.

Perhaps recognizing that impediment, defendant contends that ORS 31.710 is consistent with the common law and the purpose of compensatory damages—to " 'compensate the injured party for the injury sustained, and nothing more[.]' " *Tadsen v. Praegitzer Industries, Inc.*, 324 Or 465, 470, 928 P2d 980 (1996) (quoting *Black's Law Dictionary* 390 (6th ed 1990)). Defendant further asserts that, for more than 100 years, Oregon law has sought to put the injured party in

---

[10] Defendant cites to *Webster's II New College Dictionary* 707 (1995), which defines "monetary" in part, as "[o]f or relating to money or its circulation"; and *Black's Law Dictionary* 945 (6th ed 1990), which defines "loss," in part, as an "unintentional parting with something of value."

[11] Defendant cites to *Webster's II New College Dictionary* 562, which defines "incur" as "[t]o become liable or subject to."

the same position that he or she would have occupied had no tort been committed. *See Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.*, 310 Or 333, 344, 798 P2d 656 (1990) ("For more than a century, the general rule in Oregon in assessing damages has been that a plaintiff should recover only such sums as will compensate a plaintiff for the injury suffered as a result of a defendant's wrong.") (citing *Budd v. Multnomah St. Ry. Co.*, 15 Or 413, 419, 15 P 659 (1887)). Thus, defendant argues, where a plaintiff does not pay or have an obligation to pay an expense, the plaintiff does not suffer a loss for which a defendant may be held liable.

We have no quarrel with the maxims on which defendant relies, but they do not precisely address the issue highlighted here. In this case, plaintiff suffered bodily injury as a result of defendant's tort, and he obtained the medical treatment that was necessary to restore him, to the degree possible, to his physical state before the tortuous act. The question that this case poses is not whether plaintiff suffered loss—plaintiff's physical injuries certainly are a loss entitling him to compensatory damages. The question is whether the amount that defendant must pay as damages for that loss is limited to the amounts that plaintiff paid or remains legally obligated to pay for the medical care that he obtained to treat that loss.[12]

One answer to that question is found in the collateral source statute and the legislative policy that it imposes. As we have explained, under ORS 31.580, a plaintiff who has medical insurance that pays his or her reasonable medical bills is entitled to recover the amount of those bills from a tortfeasor. That result obtains even though the plaintiff will not have paid the medical providers and will not remain liable to the providers or, absent subrogation rights, to the insurer. Defendant's argument that a plaintiff is not entitled to seek, as "economic damages" under ORS 31.710, the medical expenses that ORS 31.580 permits the plaintiff to recover presents, in different dress, the argument against "double

---

[12] The dissent takes a different tack than does defendant. It states the issue as whether a plaintiff can recover as damages " 'costs' for which no one was ever liable." 347 Or at 245 (Kistler, J., dissenting). In taking the position that a plaintiff is not entitled to recover such costs, the dissent does not appear to contend that a plaintiff who suffers bodily injury does not suffer loss.

recovery" that we have rejected. If a plaintiff who obtains third-party benefits that cover his or her medical expenses and who does not suffer out-of-pocket loss is entitled to recover those expenses, then that plaintiff also must be entitled to seek those expenses from the tortfeasor. If we were to accept defendant's newly clothed argument, we could not give effect to ORS 31.580.

Insofar as ORS 31.710 applies to this action, we do not read its definition of economic damages to be inconsistent with the result that ORS 31.580 permits. A plaintiff who is injured and who obtains necessary medical treatment becomes "liable or subject to" reasonable charges for that treatment and thereby "incurs" them. ORS 31.710 does not require that a plaintiff also pay or otherwise satisfy those charges. Whether or by what means the plaintiff or a third party satisfies medical charges is a matter between the plaintiff, the third party, and the medical providers. ORS 31.710 does not make a plaintiff's right to assert a claim for economic damages against a tortfeasor dependent on those arrangements.

A clear indication that ORS 31.710 does not limit a plaintiff's claim to charges that the plaintiff has paid or remains legally obligated to pay is that ORS 31.710 permits a plaintiff to assert a claim for medical treatment that will be necessary in the future. For example, in *Clarke v. OHSU*, 343 Or 581, 586, 175 P3d 418 (2007), the plaintiff's economic damages of $11 million included expenses for future healthcare. *See also Mulligan v. Hornbuckle*, 227 Or App 520, 522, 206 P3d 1078 (2009) (plaintiff sought economic damages of, *inter alia*, $8,000 for future medical expenses). In those circumstances, a plaintiff can neither allege nor prove payment or a legal obligation to make payment. The plaintiff will not know or be able to determine whether the plaintiff or a third party will pay or otherwise satisfy those charges.

Defendant does not cite an Oregon case that limits a plaintiff's claim to amounts that a plaintiff pays or remains obligated to pay and we have not discovered one. Oregon courts often have stated that plaintiffs are entitled to recover "reasonable" medical *charges. See, e.g., Matthews v. City of La Grande*, 136 Or 426, 430, 299 P 999 (1931) (juries may

consider charges incurred, evidence of amount paid, and what "would be a reasonable charge * * * in connection with the plaintiff's injury" as evidence of the reasonable value of medical services provided); *Touhy v. Columbia Steel Co.*, 61 Or 527, 532, 122 P 36 (1912) ("The rule is that a plaintiff in a case involving personal injuries can recover, as a part of his damages, his reasonable expenses for * * * medical treatment, but there must be some evidence that the charges are reasonable."). And, in *Valdin v. Holteen and Nordstrom*, 199 Or 134, 147-48, 260 P2d 504 (1953), the court indicated that the amount charged for medical services is admissible evidence of the reasonableness of a provider's charges:

> "Plaintiff had the right to testify concerning the several *charges made* for the services performed in his care and treatment, *or if he had paid* for such services, as to the several amounts paid, but before such evidence could be the basis of a claim for special [economic] damages, it would be necessary to connect it by offering evidence that the *charges or amounts paid*, as the case might be, were reasonable for the services rendered, and, of course, that the services were performed."

(Emphases added.)

*Cary v. Burris*, 169 Or 24, indicates that a plaintiff may claim medical expenses as damages although he or she will not pay or have an obligation to pay the provider of the medical services. In that case, federal law assured the plaintiff that the government would provide for his medical care and that the plaintiff would not have any obligation to his medical providers. The court characterized the government program as a gratuity and held that its existence did not relieve the defendant from liability for the worth of the care that the plaintiff received. *Id.* at 28-29. The legal authority that the court cited with approval stated that, whether third-party benefits are given as a gift or in performance of a contract, a defendant has no " 'equitable or legal claim to share in the benefit.' " *Id.* at 28 (quoting *Sedgwick on Damages*). Although the court in *Cary* approached the issue as a collateral source issue and not as a pleading issue, the end result was that the court permitted the plaintiff to recover the "worth" of the medical expenses from the defendant, regardless of the fact that he would not pay money or incur

legal liability to his providers as a result of his medical treatment.

The decision in *Cary* accords with *Restatement (Second) of Torts* § 924 (1979), cited with approval by this court in *Zehr v. Haugen*, 318 Or 647, 656 n 6, 871 P2d 1006 (1994). Section 924 is entitled "Harm to the Person." It provides, in part, that "[o]ne whose interests of personality have been tortuously invaded is entitled to recover damages for the past or prospective * * * reasonable medical and other expenses[.]" Comment f to that section, entitled "Expenses," provides that an "injured person is entitled to damages for all expenses and for the *value of services* reasonably made necessary by the harm." *Restatement* § 924, comment f (emphasis added). Comment f then instructs that "[t]he *value* of medical services made necessary by the tort can ordinarily be recovered *although they have created no liability or expense to the injured person*, as when a physician donates his services." (Referring to *Restatement (Second) of Torts* § 920A (1979), which describes the collateral source rule.) (emphases added)). Thus, the *Restatement* permits a plaintiff to recover from a tortfeasor the reasonable value of the medical treatment that he or she receives whether plaintiff is liable to pay or pays the medical providers' charges for that treatment, the providers waive those charges, or a third party pays or otherwise satisfies those charges. Under that rule, and as we noted with respect to the collateral source statute, plaintiffs who incur the same injuries as a result of a defendant's tortuous actions may claim and recover the same damages.

Defendant accepts that a plaintiff who is eligible for Medicare benefits and who does not pay out of pocket for the amounts that Medicare pays on his or her behalf may seek recovery of those amounts from a tortfeasor. Defendant contests, however, a plaintiff's right to seek recovery of sums that Medicare satisfies by requiring that providers accept Medicare payment as payment in full for their services. The distinction is one without a legal difference. As we have explained, a plaintiff may claim the reasonable value of the medical charges to which the plaintiff is subject without limitation to the amount that plaintiff pays or remains liable. Similarly, a plaintiff may claim the reasonable value of medical charges without limitation to the amount that a third

party pays or remains liable to pay on the plaintiff's behalf. The law does not require either that a plaintiff suffer out-of-pocket loss or that a plaintiff satisfy medical charges by a particular means. Similarly, the law does not require that a third party acting on a plaintiff's behalf suffer out-of-pocket loss or satisfy medical charges by a particular means. Just as a plaintiff's claim against a tortfeasor is not dependent on whether or by what means the plaintiff satisfies reasonable medical charges, a plaintiff's claim is not dependent on whether or by what means a third party satisfies those charges.

The vast majority of courts to consider the issue follow the common-law rule articulated in section 924 of the *Restatement* and permit plaintiffs to seek the reasonable value of their expenses without limitation to the amount that they pay or that third parties pay on their behalf. *See Wills v. Foster*, 229 Ill2d 393, 414, 892 NE2d 1018, 1031 (Ill 2008) (so stating). In *Wills,* the Illinois Supreme Court relied on its collateral source rule to hold that the plaintiff was entitled to the full amount of her medical expenses, notwithstanding the fact that she had not paid those expenses and would not be required to do so. Medicare had satisfied the plaintiff's obligation and had done so by paying less than the amounts that the plaintiff had been billed. The court noted, as this court did in *Cary*, 169 Or at 28-29, and *Reinan*, 270 Or at 213, that the policy behind the collateral source rule—"that the wrongdoer should not benefit from the expenditures made by the injured party or take advantage of contract or other relations that may exist between the injured party and third persons," *Wills*, 229 Ill2d at 413, 892 NE2d at 1030 (citation and emphasis omitted)—militated a result in which the plaintiff could claim the full value of the medical treatment:

> "Clearly, another relationship between an injured plaintiff and a third party could be a relationship with the government that allows the plaintiff's medical expenses to be paid because of factors such as her age or income level. Similarly, an arrangement between the plaintiff and a physician who agrees to perform free medical services is a relationship with a third party who is collateral to the tortfeasor. In either case, the benefit is intended to be for the plaintiff, not for the tortfeasor."

*Id. Accord Simpson v. Saks Fifth Ave., Inc.*, 2008 WL 3388739 at
\*2 (ND Okla 2008) (applying Oklahoma law); *McMullin v. U.S.*,
515 F Supp 2d 904, 908 (ED Ark 2007) (applying Arkansas
law); *Lindholm v. Hassan*, 369 F Supp 3d 1104, 1111 (DSD
2005) (applying South Dakota law); *Bynum v. Magno*, 106
Hawai'i 81, 88, 101 P3d 1149, 1156 (Haw 2004); *Baptist
Healthcare Systems, Inc. v. Miller*, 177 SW3d 676, 682-83 (Ky
2005); *Brandon HMA, Inc. v. Bradshaw*, 809 So 2d 611, 618
(Miss 2001); *Haselden v. Davis,* 353 SC 481, 485, 579 SE2d
293, 295 (SC 2003); *Papke v. Harbert*, 738 NW2d 510, 536
(SD 2007); *Brown v. Van Noy*, 879 SW2d 667, 676 (Mo App
WD 1994).[13]

In the related circumstance of physician "write-offs"
pursuant to agreements with private insurance companies,
courts in other states also have concluded that plaintiffs are
entitled to seek and recover from tortfeasors the reasonable
medical expenses that their medical providers bill to them
without limitation to the amounts paid by their insurers.
*Mitchell v. Haldar*, 883 A2d 32, 40 (Del 2005); *Hardi v.
Mezzanotte*, 818 A2d 974, 985 (DC 2003); *Robinson v. Bates*,
112 Ohio St 3d 17, 18, 857 NE2d 1195, 1196 (Ohio 2006) (but
allowing defendant to adduce evidence of the amount paid to
satisfy medical bills); *Acuar v. Letourneau*, 260 Va 180, 192,
531 SE2d 316, 322 (Vir 2000); *Koffman v. Leichtfuss*, 246
Wis2d 31, 630 NW2d 201 (Wis 2001); *Lopez v. Safeway
Stores, Inc.*, 212 Ariz 198, 206, 129 P3d 487, 495 (Ariz App
Div 2, 2006); *Tucker v. Volunteers of America Colorado
Branch*, 211 P3d 708, 713 (Colo App 2008).[14]

---

[13] It further bears noting that other jurisdictions applying ORS 31.710 to the
question of Medicare "write-offs" have reached the same result. *Miller v. J-M Mfg.
Co., Inc.*, 2008 WL 356932 4 (D Or 2008); *Liner v. Bellingham*, Civil No CV-02-
1681-ST, Opinion and Order by Magistrate Judge Stewart, Aug 6, 2003. In *Cole v.
Builder's Square, Inc.*, 382 F Supp 2d 1200, 1201 (D Or 2003), the district court con-
sidered private insurance "write-offs" under the definition of economic damages
now codified as ORS 31.710(2)(a), but ultimately determined that, because those
"adjustments are a benefit flowing directly from that insurance," the collateral
source statute precluded judicial reduction of the verdict, irrespective of whether
the plaintiff "incurred" those charges.

[14] Defendant seeks to distinguish Medicare "write-offs" from private insurance
"write-offs" on the ground that, in the latter context, plaintiffs receive the benefit of
their bargain with their insurance companies. However, Medicare is an insurance
program for the elderly, and Medicare beneficiaries have a relationship with
Medicare that is similar to the relationship that other insureds have with their

A minority of jurisdictions have held that plaintiffs can collect from tortfeasors no more than the sums actually paid by or on behalf of the plaintiffs, but, for the most part, those courts have reached their results by relying on statutes different than those in Oregon, or a section of the *Restatement* which does not apply to bodily injuries, but instead applies to clams for the value of services tortuously obtained.[15] *See Goble v. Frohman*, 901 So 2d 830, 832-33 (Fla 2005) (noting Florida statute); *Dyet v. McKinley*, 139 Idaho 526, 529, 81 P3d 1236, 1239 (2003) (relying on Idaho Code); *Moorhead v. Crozer Chester Medical Center*, 564 Pa 156, 162, 765 A2d 786, 789 (Pa 2001) (relying on *Restatement* § 911);

---

insurers. Medicare beneficiaries also work and pay taxes, premiums, and deductibles for the insurance benefits that they receive. If they benefit from the discounted rates that the government is able to obtain, they are not less entitled to those benefits than are those who receive the benefits of private insurance programs.

There are some courts that require a plaintiff to prove that she or he has provided some consideration for the benefit of the "write-off" before the plaintiff can seek recovery. *See, e.g., Acuar*, 260 Va at 192, 531 SE2d at 322 (so holding). Those courts generally hold that Medicare beneficiaries provide such consideration. *See Rose v. Via Christi Health System, Inc.*, 276 Kan 539, 546, 78 P3d 798, 803 (2003); *Bozeman v. State*, 879 So 2d 692, 704 (La 2004) (so holding).

[15] *Restatement* § 911, comment h, provides, in part, that,

"[w]hen the plaintiff seeks to recover for expenditures made or liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged. If, however, the injured person paid less than the exchange rate, he can recover no more than the amount paid, except when the low rate was intended as a gift to him. A person can recover even for an exorbitant amount that he was reasonable in paying in order to avert further harm."

In *Bynum*, the Hawai'i Supreme Court explained that the section 911 comment is inapplicable to bodily injury actions:

"[A]s employed in § 911, the term 'value' means 'the exchange value,' and that

" 'the exchange value of property or *services* is the amount of money for which the subject matter *could be exchanged or procured* if there is a market continually resorted by traders, or if no market exists, *the amount that could be obtained in the usual course of finding a purchaser or hirer of similar property or services.*'

"(Emphases added.) Comment h only pertains to the 'value of services rendered' in the context of ascertaining the 'measure of recovery of a person *who sues for the value of his services tortiously obtained*' or when a plaintiff 'seeks to recover for expenditures *made or liability incurred to third persons for services rendered.*' (Emphases added.) This definition of 'value of services rendered' is inapplicable, for the present case does not involve a provider who is suing for the value of the medical services provided or who seeks to recover expenditures incurred to third persons."

*Bynum*, 106 Hawai'i at 91, 101 P3d at 1159.

*Hanif v. Housing Authority*, 246 Cal Rptr 192, 194-96 (Cal App Div 3 1988) (citing *Restatement* § 911 and California code); *Cooperative Leasing, Inc. v Johnson*, 872 So 2d 956, 958 (Fla App 2d Dist 2004) (citing *Restatement* § 911); *Terrell v. Nanda*, 759 So2d 1026, 1031 (La App 2000); *Kastick v. U-Haul Co. of Western Michigan*, 740 NYS2d 167, 169, 292 AD2d 797, 798 (NY App Div 4 2002).

The dissent disagrees with the *Restatement* rule that a plaintiff may recover the value of medical services made necessary by a tortuous act without regard to whether the plaintiff is liable for that sum. As the dissent explains, a plaintiff can seek and recover the reasonable value of services rendered only if the plaintiff (or someone) was, at the time the services were rendered, legally obligated to pay that value. The dissent reasons that no one "incurs" an obligation if no one is obligated legally to pay it. 347 Or at 245 (Kistler, J., dissenting). Under that reasoning, if a plaintiff receives medical services, and, after the services are rendered, the medical provider gratuitously discharges an express or implied obligation to pay for those services, the plaintiff may recover their full reasonable value from a tortfeasor. If, however, the medical provider informs the plaintiff prior to treatment that the plaintiff will have no obligation to pay for medical services, the plaintiff is not entitled to recover any sum from a tortfeasor for those necessary services. Similarly, under the dissent's reasoning, if a plaintiff receives medical services and a bill for their full reasonable value, but the medical provider has an agreement with an insurer to accept less than that sum as payment in full, and to "write off" the remainder, thus discharging the plaintiff from an express or implied contractual obligation, the plaintiff can recover from a tortfeasor the full sum charged. However, if the law, rather than an insurer's agreement, requires the "write-off," the plaintiff cannot recover the amount "written off."

The only reason that the dissent gives for its position, other than that it is compelled by the legislature's use of the word "incurred," is that "no compensatory purpose is served by holding a defendant responsible for more than [costs incurred]." 347 Or at 245 (Kistler, J., dissenting). If the dissent means to argue that a plaintiff can only recover as damages the amount necessary to compensate him or her for

out-of-pocket loss, then the dissent's construct does not accomplish that purpose. Whether a plaintiff does not incur a legal obligation or incurs a legal obligation that is discharged or satisfied, the plaintiff does not suffer out-of-pocket loss. To hold a defendant responsible in the latter instance and not in the former serves no greater compensatory purpose.

Although the collateral source statute, ORS 31.580, does not directly address the issue of the damages that a plaintiff in a personal injury action may seek, it reflects a legislative decision to permit plaintiffs to recover damages from tortfeasors even if, due to insurance and or benefits, including Medicare benefits, they do not suffer out-of-pocket loss, and the damages therefore serve no compensatory purpose. In enacting ORS 31.580, the legislature chose to make tortfeasors who cause the same injuries liable to the same extent and to leave arrangements between plaintiffs and their providers and insurers to other law.

Furthermore, we do not necessarily agree with the dissent's premise—that "federal law makes clear that no costs were incurred in this case over the Medicare cap[,]" 347 Or at 252 (Kistler, J., dissenting), and thus that the bills that plaintiff's medical providers sent and the contracts that they required plaintiff to execute violated federal law. 347 Or at 249 (Kistler, J., dissenting).[16] The Social Security Act more reasonably may be interpreted to limit not the amounts a beneficiary may incur but the amounts that Medicare will pay *"to [injured beneficiaries] or on their behalf."* 42 USC §§ 1395d(a), 1395k(a)(1) (emphasis added).[17] *See also* 42 USC § 1395(y)(a)(2) (no payment by Medicare "may be made under

---

[16] The dissent quotes portions of Medicare Part B that prohibit nonparticipating physicians from billing a patient more than "the limiting charge." 347 Or at 249 (Kistler, J., dissenting). As we explained in footnote 8, it appears to us that all of plaintiff's treating physicians were participating physicians not subject to the prohibitions that the dissent cites.

[17] The dissent takes the position that plaintiff is not liable for his hospital expenses but contends that he can recover those expenses because Medicare itself is liable for them. 347 Or at 251 n 7 (Kistler, J., dissenting). The statutes quoted make it clear, however, that Medicare beneficiaries, not Medicare, incur liability to medical providers. Medicare's only responsibility is to make payment *to or on behalf of* those beneficiaries. If those beneficiaries are not liable, as the dissent claims, then neither is Medicare, and, under the dissent's reasoning, because no one is liable, defendant is not required to pay the reasonable value of the hospital services plaintiff received.

part A or part B * * * for any expenses incurred for items or services * * * for which the individual furnished such items or services has no legal obligation to pay").

Because we decide that an injured person who receives medical services and who is billed for those services may seek the reasonable value of that treatment in a claim against a tortfeasor, a definitive interpretation of the Social Security Act is not crucial to our holding. But we do point out that all of the medical providers that rendered services to plaintiff billed him for the full reasonable value of that treatment, and defendant reasonably did not contend that plaintiff, by contract, had not agreed to pay those bills. Whether the Medicare laws benefitted plaintiff by providing that he was not legally obligated to pay those bills or instead provided a means for their discharge is of no legal consequence in this tort action. In either instance, plaintiff obtained treatment with the same reasonable value. In either instance, plaintiff received the benefits of the Medicare program that he earned through employment or payment of premiums, and those benefits do not reduce the amount that he can seek or recover from defendant.

In sum, the common-law rule, as it has been articulated in the *Restatement* and the majority of jurisdictions, is that the plaintiff in a personal injury action is entitled to claim and recover from a tortfeasor the reasonable value of the medical services charged without limitation to the sums for which plaintiff is legally liable, that plaintiff has paid for those services, or that a third party has paid on plaintiff's behalf. Tying a plaintiff's claim to the amount that a third party has paid or satisfied undermines the collateral source rule by effectively linking the tortfeasor's obligation to the plaintiff's relationship with a third-party benefit provider. Moreover, exclusion of "write-offs" from the amount that a plaintiff may claim creates the anomaly that a defendant will be liable for the full reasonable charges that a medical provider makes to an uninsured person who is injured, but may have more limited liability if the injured person is insured or the beneficiary of other third-party benefits.

We conclude that ORS 31.580 and the law of economic damages should and do work in harmony and permit plaintiff to claim and recover from defendant the reasonable value of the medical expenses for which he was billed and which were necessary to treat his injuries, *viz.*, the same amount that plaintiff would have been entitled to claim and recover were he not eligible for Medicare benefits. Plaintiff's claim is not limited to the amounts that he paid or that Medicare paid on his behalf.

## IV. DEFENDANT'S EVIDENTIARY ARGUMENT

 In its final, alternative, evidentiary argument, defendant contends that, if the amount that Medicare paid plaintiff's medical providers does not establish the limits of defendant's liability, then it is at least admissible evidence of the reasonable value of the services that they rendered. The amount that one pays for services generally is admissible and often may be an important factor in determining the reasonable value of those services. *See Oliver v. N. P. T. Co.*, 3 Or 84, 87 (1869) ("In estimating damages, it is proper to consider loss of time, money necessarily paid, or debts necessarily incurred in curing the bodily injury * * *."). But, in the circumstances where it applies, ORS 31.580(2) precludes the admission of such evidence when it discloses the existence and amount of a collateral source benefit:

> "Evidence of the [collateral] benefit [received by plaintiff] * * * and the cost of obtaining it is not admissible at trial, but shall be received by the court by affidavit submitted after the verdict by any party to the action."

In this case, ORS 31.580(2) prohibited defendant from proving to the jury the benefits that plaintiff received from Medicare—the satisfaction of his obligations to his providers by both payment and "write-offs."

That did not mean, however, that defendant was required to accept liability for the charges that plaintiff sought to recover. Plaintiff had the burden of proving to the jury that his claimed medical expenses were reasonable. Defendant could have put plaintiff to his proof and could have called witnesses to testify that the amounts that plaintiff sought were unreasonable. Instead, defendant stipulated

at trial that the bills that plaintiff submitted as evidence were reasonable. Therefore, defendant is bound by the jury's factual determination and award.

## V. CONCLUSION

The trial court did not err in declining to limit plaintiff's claim or recovery to the amounts that Medicare actually paid plaintiff's providers or in prohibiting defendant from offering evidence of those payments.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**KISTLER, J.,** dissenting.

The majority holds that plaintiff may recover, as economic damages, medical costs that Medicare prevented plaintiff's medical providers from charging for their services. The majority's decision is at odds with both federal and state law. As a matter of federal law, the statutes governing Medicare capped the costs of plaintiff's medical care; neither plaintiff nor Medicare incurred more medical costs than the Medicare statutes permitted. As a matter of state law, the only economic damages arising from plaintiff's injury were the medical costs for which plaintiff was liable and for which Medicare reimbursed his providers. Because I would hold that plaintiff cannot recover economic damages for medical costs for which no one was ever liable, I respectfully dissent.

Plaintiff was injured on defendant's premises. As a result of that injury, plaintiff had reconstructive surgery on his shoulder and knee. Plaintiff was over 65 at the time of the accident, and Medicare both provided coverage for plaintiff's medical costs and capped the amount that plaintiff's medical providers could charge for their services. In this case, Medicare capped plaintiff's medical costs at approximately $13,400; that was the amount that Medicare paid plaintiff's medical providers and neither plaintiff nor Medicare ever was liable for more than that amount. Without that cap, plaintiff's medical providers would have charged approximately $39,000 for their services.

The question that this case presents is whether plaintiff can recover economic damages for the difference

between the Medicare capped rate and the medical providers' customary rate. Put differently, the question is whether plaintiff can recover economic damages from defendant for approximately $25,600 in medical "costs" for which no one was ever liable.

The answer to that question is, or should be, simple. Economic damages compensate a plaintiff for the costs incurred as a result of a defendant's tort. A defendant should be responsible for all costs incurred, but no compensatory purpose is served by holding a defendant responsible for more than that. In this case, the Medicare statutes limited the costs incurred as a result of plaintiff's injury and imposed a corresponding limitation on the amount of economic damages that plaintiff could recover.

That limitation on the amount of damages is separate from the collateral source doctrine. The collateral source doctrine addresses whether a defendant may take advantage of a benefit that a plaintiff receives from a collateral source (someone other than the defendant) to reduce the amount of damages that a judge or jury has awarded. *See* ORS 31.580 (codifying doctrine); Fowler V. Harper, Fleming James, Jr., Oscar S. Gray, 4 *Harper, James and Gray on Torts* § 25.22, 801-04 (2007) (describing common-law doctrine). The collateral source doctrine does not address the amount of damages that a plaintiff can recover in the first instance. That much is clear from the terms of ORS 31.580, which provides that the collateral source doctrine comes into play only after "a party is awarded damages for bodily injury or death of a person." By its terms, ORS 31.580 presumes an existing award of damages and is limited to the question of how much of that award a defendant owes.

In my view, the majority does not keep those two doctrines separate. Rather, it appears to rely on the collateral source doctrine to define the amount of economic damages that plaintiff can recover and in doing so errs. This dissent first explains that, as a matter of federal law, the Medicare capped rate limited the costs incurred as a result of plaintiff's injury; no one incurred more than that amount. This dissent then explains that, as a matter of state statute, plaintiff's economic damages are limited to the costs that were incurred.

Finally, it explains why the collateral source statute does not provide a basis for awarding plaintiff more damages than the statute defining economic damages permits.

## I. MEDICARE CAPS THE MEDICAL COSTS INCURRED

Plaintiff received medical services from eight providers. Seven provided physician services, which are covered under Medicare Part B. One provided inpatient hospital services, which are covered under Medicare Part A. Medicare Part A and Medicare Part B are subject to different statutory provisions, and this opinion begins by discussing the limitations that Medicare Part B places on the amount that physicians can charge Medicare beneficiaries.

Medicare Part B sets a reasonable charge (or Medicare approved charge) for medical services that a physician provides. As initially enacted, Medicare Part B did not limit the amount that a physician could charge a Medicare beneficiary unless the physician accepted assignment of the beneficiary's Medicare claim. *See* 1 *Medicare and Medicaid Guide* (CCH) ¶ 3186, 1184 (Nov 20, 2007) (explaining the history of Part B). Rather, Medicare paid 80 percent of the Medicare approved charge, leaving the beneficiary responsible for the remainder of the physician's customary charge. *Id.* Beginning in 1987, however, Medicare Part B capped the amount that physicians can charge Medicare beneficiaries. *Id.* Since 1991, that cap has taken the form of a "limiting charge," which is a percentage of the Medicare approved charge. 42 USC § 1395w-4(g)(2)(C). Under Part B, "[n]o person is liable for payment of any amounts billed for the service in excess of [the] limiting charge." 42 USC § 1395w-4(g)(1)(A)(ii).

The "limiting charge" establishes both the maximum that a physician can charge a Medicare beneficiary and the maximum for which a Medicare beneficiary will be liable. Physicians who do not accept assignment of Medicare claims can charge Medicare beneficiaries an amount up to the limiting charge. 42 USC § 1395w-4(g)(2)(C). Those physicians, however, may not "bill or collect an actual charge in excess of the limiting charge." 42 USC § 1395w-4(g)(1)(A)(i). And, as noted, "[n]o person is liable for payment of any amounts billed for the service in excess of [the] limiting charge."

42 USC § 1395w-4(g)(1)(A)(ii). If a physician has not accepted assignment, a Medicare beneficiary is responsible for paying the physician's bill up to the amount of the limiting charge, and Medicare will reimburse the beneficiary for 80 percent of the limiting charge. Under Medicare Part B, a patient is not liable for the physician's customary charge to the extent it exceeds the Medicare "limiting charge."[1]

Medicare Part A covers inpatient services in hospitals and similar facilities. Under Part A, a Medicare beneficiary is liable for a lesser amount of the cost than under Part B. Specifically, 42 USC § 1395cc(a)(1)(A)(i) provides that a hospital cannot receive payments under Medicare Part A unless it agrees "not to charge, except as provided in paragraph (2), any individual or any other person for items or services for which such individual is entitled." Paragraph 2 of subsection 1395cc(a) lists the exceptions to that limitation on liability, which include: (1) payment of a deductible for each stay in the hospital ($1,068 in 2009); (2) daily coinsurance payments if the stay exceeds 60 days (either the hospital's customary rate or a percentage of the deductible, whichever is lower); and (3) the additional cost of noncovered services, such as a private room, that the patient expressly requests. 42 USC § 1395cc(a)(2); *see* 3 *Medicare and Medicaid Guide* (CCH) ¶ 13,010, 5307-08 (Dec 2, 2008) (describing costs for which beneficiaries will be liable under Medicare Part A).

Medicare Part A differs from Medicare Part B in that Part A permits a hospital to charge a Medicare beneficiary only for the cost of the deductible and other charges. A beneficiary is not liable, under Part A, for the cost of inpatient hospital services up to the amount of Medicare cap—the amount that Medicare reimburses the hospital.[2] However, both Part

---

[1] Physicians who accept assignment of a Medicare beneficiary's claim are limited to a lesser amount. They may not charge the beneficiary more than the Medicare approved amount, which is slightly less than the "limiting charge." 42 USC § 1395u(b)(3)(B)(ii) (physicians who accept assignment agree that the "reasonable charge [set by Medicare] is the full charge for the service"); *see* 1 *Medicare and Medicaid Guide* (CCH) ¶ 3186, 1184 (same). Because the reasonable charge is less than the limiting charge, the limiting charge establishes the maximum amount that any physician can charge a Medicare beneficiary for medical services and the maximum amount for which the beneficiary will be liable.

[2] Since 1983, Medicare has capped the payments to hospitals and similar facilities by providing a set amount, adjusted for certain costs, for each condition

A and Part B are identical in that neither part permits a hospital or a physician to charge more than the Medicare capped amount. Under both Part A and Part B, no one incurs or is liable for a hospital or a physician's customary charges to the extent that those charges exceed the Medicare cap.

Plaintiff argues, however, that he agreed to pay and was liable for the full amount of his providers' customary charge.[3] The record does not support that assertion. As noted, plaintiff received medical services from eight providers. The agreements with two of those providers are in the record. One agreement, with Open Advanced MRI & CT, reminds patients that "whether you have health insurance coverage or not, professional services are rendered to and charged to the patient." It then adds, "You (or the responsible party in the case of a minor) are responsible for payment of your bill even if not covered in full or in part by your insurance."[4] The part of the agreement on which plaintiff relies states only that plaintiff remains responsible for payment of his bill, even if he has insurance. The agreement says nothing about the rate that plaintiff agreed to pay or whether plaintiff is responsible for any amounts over and above what Medicare permits. The agreement is silent on that point.

---

diagnosed. *See* 1 *Medicare and Medicaid Guide* (CCH) ¶ 4202 (June 16, 2009) (describing history and methodology of setting payments to hospitals under Medicare Part A); 42 CFR § 412.60 (specifying procedures for determining Medicare payments under Part A).

[3] *In resolving defendant's motion to reduce the verdict, the trial court recited* that "it is undisputed that * * * the plaintiff contractually agreed to pay" his medical providers' customary charges. Defendant, however, argued in its motion that plaintiff had not "incurred" his providers' customary charges to the extent that they exceed the amount that Medicare paid, and it quoted the federal district court opinion in *Wildermuth v. Staton*, No CIV.A. 01-2418-CM, 2002 WL 922137 at *5 (D Kan, Apr 29, 2002), for the proposition that " 'Medicare providers are prohibited under Medicare law and regulations from seeking reimbursement of the written-off amounts from any source.' "

[4] Paragraph 2 of the agreement states:

"Payment is preferred at the time of service as a courtesy and if you supply all information needed today, we will bill your primary insurance carrier and give you an insurance form for other billing. This does not waive your responsibility for payment. Remember whether you have health insurance coverage or not, professional services are rendered to and charged to the patient. This office cannot accept responsibility for collecting any insurance claim or negotiating a settlement on a disputed claim. You (or the responsible party in the case of a minor) are responsible for payment of your bill even if not covered in full or in part by your insurance."

Medicare Part B prevents entities providing physician services, such as Open Advanced MRI, from billing a patient more than the limiting charge.[5] As noted, nonparticipating physicians may not bill a Medicare beneficiary for more than the limiting charge, and "[n]o [beneficiary] is liable for payment of any amounts billed for the service in excess of [the] limiting charge." 42 USC § 1395w-4(g)(1)(A)(ii). It is hardly surprising that Open Advanced MRI's agreement does not impose an obligation on its patients that would be contrary to federal law. Its agreement does not support plaintiff's position.

Plaintiff's agreement with Southwest Washington Medical Center presents a closer question but still does not support plaintiff's position. Paragraph 10 of that agreement states:

"I, the undersigned, agree * * * that in consideration of the services to be provided that the undersigned hereby obligates himself/herself * * * to pay the account of SWMC in accordance with its regular rates and terms. I further agree to pay for services denied or not covered by my insurance regardless of the reason for denial or non-coverage. I agree to pay for services not covered by my Medicaid program even if I did not disclose my Medicaid eligibility at registration or obtain eligibility on a retroactive basis."

Plaintiff presumably interprets the agreement obligating him "to pay the account of SWMC in accordance with its regular rates and terms" as an agreement to accept liability for the hospital's customary charges. While textually permissible, that interpretation conflicts with Medicare Part A, which requires hospitals to agree not to charge Medicare beneficiaries for their services except as expressly authorized.[6]

It is also equally permissible to read the agreement consistently with federal law; that is, the agreement "to pay * * * SWMC in accordance with its regular rates and terms"

---

[5] Physician services include diagnostic tests, such as an MRI. *See* 42 CFR § 414.2 (defining physician services).

[6] Southwest Washington Medical Center's bill makes clear that it provided hospital inpatient services subject to Part A rather than physician services subject to Part B.

refers to those "rates and terms" that Medicare Part A permits. One should hesitate to assume that the nonspecific phrase "regular rates and terms" refers to rates and terms that are contrary to federal law. The third sentence in paragraph 10 supports that reading. It provides that the patient "agree[s] to pay for services not covered by my Medicaid program." If the first sentence were as broad as plaintiff perceives, the third sentence in paragraph 10 would be unnecessary. That is, if the first sentence in paragraph 10 required a Medicaid beneficiary to assume responsibility for all the hospital's customary charges, there would be no need to specify in the third sentence that a Medicaid beneficiary agrees to pay for those services that Medicaid does not cover. In any event, if the agreement with Southwest Washington Medical Center purported to impose liability on plaintiff for all the hospital's customary charges, it would be inconsistent with Medicare Part A, and federal law would negate any contrary obligation that that agreement sought to impose.

Plaintiff did not introduce any other agreements that he may have had with his other six medical providers, all of whom were physicians. The burden of production was on plaintiff to prove the extent of his damages, and the absence of those agreements cuts against him. Beyond that, as explained above, Medicare Part B prevents a physician from charging more than the limiting charge. There is no reason to assume that plaintiff's doctors entered into agreements contrary to federal law, and, even if they did, federal law would supersede those agreements. As a matter of federal law, neither plaintiff nor Medicare incurred liability for any medical charges in excess of the Medicare cap.

## II. ECONOMIC DAMAGES ARE LIMITED TO COSTS INCURRED

"For more than a century, the general rule in Oregon in assessing damages has been that a plaintiff should recover only such sums as will compensate a plaintiff for the injury suffered as a result of a defendant's wrong." *Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.*, 310 Or 333, 344, 798 P2d 656 (1990). ORS 31.710(2)(a) embodies that principle. It defines "economic damages" as "objectively verifiable monetary losses including but not limited to reasonable charges

necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services * * *." That statute assumes that, at a minimum, charges for medical services must be "incurred" to be recovered as economic damages. As the majority notes, incurred means "become liable or subject to." *See Webster's Third New Int'l Dictionary* 1146 (unabridged ed 2002) (defining incur). And federal law makes clear that no one (neither plaintiff nor Medicare) became liable for any medical costs over the Medicare cap. The Medicare cap limits the amount of medical costs incurred as a result of plaintiff's injury, and ORS 31.710(2)(a) only permits recovery of those costs incurred as a result of defendant's tort.[7]

That limitation also follows from this court's precedent. This court's cases have long recognized that the reasonable value of a doctor's services limits the amount of economic damages that a plaintiff can recover; that is, if the amount that a doctor charges for medical services exceeds the reasonable value of those services, a plaintiff can recover only the reasonable value. *Touhy v. Columbia Steel Co.*, 61 Or 527, 532-33, 122 P 36 (1912).[8] The converse is not true, however. This court has never held nor suggested that, when the agreed charge for medical services is less than its reasonable value, a plaintiff may recover the reasonable value of those services. Such a rule would be antithetical to the principle that "a plaintiff should recover *only* such sums as will compensate a plaintiff for the injury suffered as a result of a defendant's wrong." *Yamaha Store of Bend, Inc.*, 310 Or at

---

[7] ORS 31.710(2)(a) does not, by its terms, limit the amount of economic damages to the costs incurred by the plaintiff. In this case, both plaintiff and Medicare incurred costs for medical services as a result of defendant's acts, and defendant has not argued that it is not liable for the costs that plaintiff and Medicare incurred. Rather, it has argued only that it is not liable for costs that no one incurred.

[8] In *Touhy*, the plaintiff introduced into evidence the bills for medical treatment that he received as a result of the defendant's negligence but submitted no evidence that those charges were reasonable. 61 Or at 530. This court held that, without evidence that the charges were reasonable, the plaintiff could not recover the cost of his medical treatment and directed that the amount of those bills be deducted from the judgment for plaintiff. *Id.* at 532-33. The court explained that "[t]he rule is that a plaintiff in a case involving personal injuries can recover, as a part of his damages, his reasonable expenses for medicines and medicinal treatment, but there must be some evidence that the charges were reasonable." *Id.* at 532.

344 (emphasis added). It also would be contrary to the use of the word "incurred" in the definition of economic damages in ORS 31.710(2)(a).

The majority questions whether the definition of economic damages found in ORS 31.710(2)(a) is limited to determining whether a statutory cap on economic damages applies. This court, however, has not limited the definition to that context. For instance, in *Zehr v. Haugen*, 318 Or 647, 656-67, 871 P2d 1006 (1994), the court relied on the definition of economic damages in ORS 31.710(2)(a) to determine whether the economic damages that the plaintiffs sought as part of their medical malpractice claim were recoverable.[9] If the statutory definition of economic damages were limited to determining whether the statutory cap on economic damages applies, as the majority suggests, the court would not have considered that definition in *Zehr* to determine whether the damages sought in that case were recoverable. *See also Clarke v. OHSU*, 343 Or 581, 608 n 17, 175 P3d 418 (2007) ("Special damages now are described [in ORS 31.710(2)(a)] as economic damages and refer to the verifiable out-of-pocket losses, including medical expenses * * *.").

The definition of economic damages in ORS 31.710(2)(a) limits defendants' damages to the costs incurred, and federal law makes clear that no costs were incurred in this case over the Medicare cap. ORS 31.710(2)(a) and the Medicare cap combine to limit the amount of economic damages that the jury could award plaintiff.

## III. THE COLLATERAL SOURCE STATUTE

The majority bases its opinion primarily on the collateral source statute. In the first part of its opinion, the majority asks whether the collateral source statute applies, but in doing so it assumes that plaintiff was liable for his medical providers' customary charges. The first part of the court's opinion thus assumes away what is, in my view, the

---

[9] Additionally, ORS 31.705 requires that jury verdicts in civil actions seeking damages arising out of bodily injury "shall set forth separately economic damages and noneconomic damages, if any, as defined in ORS 31.710." That requirement is not limited to cases in which a plaintiff's prayer exceeds the statutory cap on economic damages, confirming that the legislature's definition of economic damages is not as narrow as the majority suggests.

dispositive question. In the second part of its opinion, the majority asks "whether the amount that defendant must pay as damages for that loss is limited to the amounts that plaintiff paid or remains legally obligated to pay for the medical care that he obtained to treat that loss." 347 Or at 233. And it undertakes to answer that question in four related but separate ways.

The majority looks initially to the collateral source statute to answer the question it poses. It notes that, under the collateral source statute, a plaintiff may recover his or her medical costs from a defendant even though an insurer has paid those costs and the plaintiff does not remain legally obligated to pay them. *Id.* The majority reasons that the same answer should apply in this case. *Id.* at 233-34. The majority concludes that, if we were to reach a different answer, we could not give effect to ORS 31.580. *Id.* at 234.

In my view, the majority asks and answers the wrong question. The question is not whether plaintiff has paid or remains liable to pay its medical charges. Rather, the question is whether plaintiff ever incurred liability for those charges. That follows from ORS 31.710(2)(a), which provides that costs must be "incurred" to constitute economic damages. The collateral benefits statute does not point in a different direction. As noted, ORS 31.580 has nothing to do with the amount of damages a plaintiff incurs. That statute applies only after "a party is awarded damages for bodily injury or death." It assumes that a judge or jury has determined the amount of damages and provides a rule to determine how much of those damages a defendant owes.

The majority reasons next that "[a] plaintiff who is injured and who obtains necessary medical treatment becomes 'liable or subject to' reasonable charges for that treatment and thereby 'incurs' them." *Id.* at 234. The majority's reasoning sweeps too broadly. Ordinarily, the charge incurred for medical services turns on the terms of the agreement between the patient and the medical provider; that is, a patient ordinarily will be liable for and will incur whatever charges he or she agrees to pay a medical provider. That is true without regard to whether the patient agrees to pay

more or less than the reasonable charge. The rule the majority posits applies only when no agreement exists and the law implies a reasonable charge. *See Cronn v. Fisher*, 245 Or 407, 416, 422 P2d 276 (1966) (discussing *quantum meruit*). In this case, the Medicare statutes imposed an *a priori* limit on the charges incurred for medical services. No one incurred any charges over and above that cap, and plaintiff may not recover damages for medical costs that no one incurred.

Although the majority relies on *Cary v. Burris*, 169 Or 24, 127 P2d 126 (1942), as support for its reasoning, that decision addresses a related but different issue. In *Cary*, an employee of the federal government was injured in an automobile accident. *Id.* at 25. The defendant alleged, as a partial defense, that the United States had paid the employee's medical costs. *Id.* The employee admitted in his reply that "the United States Employees' Compensation Commission had advanced all said sums but that he would be required to reimburse the commission for said advances out of the proceeds of the judgment [against defendant] when collected." *Id.* at 25-26. The trial court ruled that the employee could recover damages for the money that the United States had advanced for his medical treatment, and this court affirmed. *Id.* at 29.[10] In reaching that conclusion, this court recognized that a federal statute required the employee to reimburse the United States for any funds that it had advanced to pay for his medical costs. *Id.* at 27; *see Dahn v. Davis*, 258 US 421, 430, 42 S Ct 320, 66 L Ed 696 (1922) (discussing federal statute).

The decision in *Cary* addressed a typical situation in which a third party, such as an insurer, has paid medical expenses for which the plaintiff would otherwise be liable, and the question was whether the defendant could avoid responsibility for those expenses. *Cary* did not address a situation in which federal law limited the amount that a medical provider could charge a plaintiff in the first instance. In

---

[10] Initially, the trial court ruled that the jury could not consider those sums as an element of the plaintiff's damages. The court then allowed the plaintiff's motion for a new trial on the ground that its damages ruling was erroneous, the defendant appealed to this court from that ruling, and this court affirmed. *Id.* at 26.

my view, *Cary* neither advances nor detracts from the majority's reasoning.

The majority also relies on cases from other jurisdictions. As the majority notes, courts from other jurisdictions have split on this matter both in the result that they have reached and also in their analysis. Some have held, as I would, that a plaintiff cannot recover damages for costs that no one incurred. *See Moorhead v. Crozer Chester Medical Center*, 765 A2d 786, 789-91 (Pa 2001) (holding that the reasonable value of medical services that a Medicare beneficiary received cannot exceed "the amount that the plaintiff has actually paid or for which he or she has incurred liability"); *Hanif v. Housing Authority*, 246 Cal Rptr 192, 194-96 (Cal App 3 Dist 1988) (holding that a state Medicaid beneficiary cannot "recover from the tortfeasor more than the actual amount he paid or for which he incurred liability for past medical care and services"). Other courts have held that the amount Medicare pays is, while not dispositive, admissible evidence on the reasonable value of medical services. *Robinson v. Bates*, 857 NE2d 1195, 1200 (Ohio 2006). Still other courts have held, as the majority does, that a plaintiff can recover the reasonable value of the services received without regard to the limitations that Medicare or Medicaid places on the costs that a medical provider charges. *See, e.g.*, *Bynum v. Mango*, 106 Hawai'i 81, 88, 101 P3d 1149, 1556-57 (Haw 2004); *Brandon HMA, Inc. v. Bradshaw*, 809 So 2d 611, 619-20 (Miss 2001).

Those various decisions establish that, at a minimum, the issue is one about which reasonable people can and have disagreed.[11] Beyond that, the decisions do not have much bearing on the inquiry before us. The Oregon legislature has chosen to codify both the collateral benefit rule and the definition of economic damages. While other states' common-law decisions may be informative and even persuasive in the abstract, ORS 31.710(2)(a) and ORS 31.580 define

---

[11] Part of the difficulty arises, I suspect, from the fact that Medicare was not written with tort law in mind. When Congress decided to provide a system of medical coverage for persons over 65 years of age, it did not necessarily consider how the limitations it imposed on medical costs would affect a plaintiff's ability to recover damages for medical services resulting from a defendant's tortious acts. We are, however, obliged to make that determination.

the scope of our inquiry in determining the extent of the damages that plaintiff may recover. As I read ORS 31.710(2)(a), it requires that costs be incurred before they may be recovered as economic damages. Conversely, ORS 31.580 has nothing to do with determining the extent of the damages that a plaintiff may recover. Rather, it defines a defendant's responsibility for those damages that a judge or jury has awarded. Given those two statutes, I would hold that a plaintiff cannot recover economic damages for medical costs that no one ever incurred.

The majority notes one final point. It cites 42 USC § 1395y(a)(2) for the proposition that Medicare would not have made payments to plaintiff's medical providers if plaintiff had not agreed to assume liability for their customary charges. 347 Or at 241-42. That paragraph provides:

> "Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services—
>
> "* * * * *
>
> "(2) for which the individual furnished such items or services has no legal obligation to pay, and which no other person * * * has a legal obligation to provide or pay for * * *."

In my view, the majority reads paragraph 1395y(a)(2) for more than it is worth. That paragraph is one of 21 exclusions from Medicare coverage, which range from eyewear to pedicures. *See* 42 USC § 1395y(a)(7) (excluding coverage for eyewear); 42 USC § 1395y(a)(13)(C) (excluding coverage for pedicures). The exclusion that the majority cites applies to services "for which the individual furnished such * * * services has *no* legal obligation to pay, and [for] which *no* other person * * * has a legal obligation to provide or pay." 42 USC § 1395y(a)(2) (emphasis added).

By its terms, paragraph 1395y(a)(2) excludes from Medicare coverage only those services provided for free, without expectation of payment from anyone. As the agency charged with administering Medicare has explained, the exclusion "applies where items and services are furnished

gratuitously without regard to the beneficiary's ability to pay and without expectation of payment from any source, such as free x-rays or immunizations provided by health organizations." Center for Medicare Services, *Medicare Benefits Policy Manual*, Pub 100-02, ch 16, § 40.

This is not a case in which plaintiff's medical providers furnished services gratuitously without expectation of payment from anyone. Rather, plaintiff had an obligation to pay, at a minimum, the deductible for the inpatient hospital services he received under Part A and 20 percent of his physicians' charges under Part B. And Medicare had an obligation to pay the remainder of the charges up to the Medicare approved amount. In my view, the majority errs in converting an exclusion from Medicare coverage for completely gratuitous services into an implicit requirement that Medicare beneficiaries assume liability for all of their medical providers' customary charges.

As I read the governing Oregon statutes, medical charges must be incurred to be recovered as economic damages. In this case, neither plaintiff nor Medicare ever incurred liability for more than the Medicare cap. It follows that plaintiff may not collect damages for costs that no one incurred. I respectfully dissent.

Balmer, J., joins this dissenting opinion.