JAMES, J., dissenting.
Although this case comes to us in the context of criminal restitution, the issue this case presents is really *40 one of civil damages, in particular, what is the minimum sufficient evidence of the "reasonableness" of medical expenses necessary to overcome a defense motion for directed verdict as to economic damages. The answer to that seemingly simple question, as developed through the decisions of this court and the Oregon Supreme Court, has been less than logically consistent. As a result, routine Oregon practice has developed in a manner that is arguably overly formalistic, needlessly time consuming at trial, and ultimately unhelpful to the jury. The majority opinion perceives these same problems and, in its own way, offers a new path forward. For that, I commend it. But as I will discuss, the majority's path leads to results and implications that I cannot accept, and therefore I regrettably cannot join in that opinion.
"Economic damages" is a term defined by statute. ORS 31.710(2)(a) provides, in part: "(a) 'Economic damages' means objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services." (Emphases added.) The definition encompasses two distinct concepts that are sometimes subtly blurred in litigation. Reasonableness is the assessment of economic value. Necessity is the causal link between the medical bill incurred and the injury alleged. We have held that ORS 31.710(2)(a) incorporated the common law understanding of economic damages into the statute when it was enacted. White v. Jubitz Corp ., 219 Or. App. 62, 68, 182 P.3d 215 (2008), aff'd , 347 Or. 212, 219 P.3d 566 (2009) ; State v. McClelland , 278 Or. App. 138, 145, 372 P.3d 614, rev. den. , 360 Or. 423, 383 P.3d 862 (2016).
Drawing from a series of cases beginning in 1912, the law of economic damages, as applied to the reasonableness of medical bills, appears to be as follows: First, the Oregon Supreme Court has said that a medical bill is admissible and relevant as to reasonableness. See, e.g. , Mathews v. City of La Grande , 136 Or. 426, 430, 299 P. 999 (1931) (juries may consider charges incurred, evidence of amount paid, and what "would be a reasonable charge * * * in connection with the plaintiff's injury" as evidence of the reasonable value of medical services provided). But, the court has also held that, *41 while being admissible and relevant as to reasonableness, a bill alone is insufficient evidence of reasonableness so as to survive directed verdict. See, e.g. , Tuohy v. Columbia Steel Co. , 61 Or. 527, 532, 122 P. 36 (1912).
Second, the court has held that evidence of payment of a medical bill is also admissible and relevant as to reasonableness. Mathews , 136 Or. at 430, 299 P. 999. But, the court has strongly implied, and arguably explicitly stated, that evidence of payment of a medical bill alone is insufficient evidence of reasonableness so as to survive directed verdict. In Valdin v. Holteen and Nordstrom , the court held:
"Plaintiff had the right to testify concerning the several charges made for the services performed in his care and treatment, or if he had paid for such services, as to the several amounts paid, but before such evidence could be the basis of a claim for special [economic] damages, it would be necessary to connect it by offering evidence that the charges or amounts paid, as the case might be, were reasonable for the services rendered, and, of course, that the services were performed."
199 Or. 134, 147-48, 260 P.2d 504 (1953).
Finally, we have found that the testimony of a witness is sufficient to establish reasonableness so as to survive directed verdict-even when the testifying witness is a physician who created one of the medical bills at issue. See, e.g. , Ellington v. Garrow , 213 Or. App. 490, 496, 162 P.3d 328 (2007) ; Valdin , 199 Or. at 147-48, 260 P.2d 504. That testimony is sufficient even when it supports multiple competing inferences, so long as it can be *461 construed as responsive to the question of reasonableness.
"When asked if he had an opinion concerning whether plaintiff's medical expenses were reasonable, Stewart testified that '[t]he [physical therapy] seems a bit high. Beyond that the others appear appropriate.' As defendant concedes in her brief, '[t]here is no question that Dr. Stewart's testimony is evidence on the reasonableness of the physical therapy bills.' Defendant would have us conclude, however, that the only possible inference from that testimony is that the physical therapy bills were not reasonable. Stewart's observation that the charges other than for physical therapy were appropriate might permit an inference that the *42 charges for physical therapy were not, but it does not establish it."
Ellington , 213 Or. App. at 496, 162 P.3d 328 (brackets and emphasis in original).
Oregon trial practice has developed in response to this case law. Parties may stipulate to the reasonableness of the medical bills and focus their arguments instead on the necessity of treatment. But when the parties do not stipulate, even when the bill is from an accredited and regulated healthcare provider and there is no actual dispute as to reasonableness, the plaintiff is compelled to bring an expert to testify at trial in the plaintiff's case-in-chief as to the reasonableness of the medical bills. Such testimony may be provided by the treating physician, but given how medical billing has evolved in the modern delivery of healthcare services, treating physicians sometimes have little knowledge of their own billing. Consequently, medical billing experts may testify in the physicians' stead; these billing experts comprise a group of professional witnesses who make the rounds of Oregon courts in personal injury cases.
These professional witnesses may be called to testify late in the plaintiff's case at trial to summarize the bills and declare them "reasonable," while potentially drawing objections from opposing counsel to their rendering of an opinion as to the reasonableness of the bills in their entirety. This may result in the witness offering testimony as to each bill individually-sometimes a multi-hour affair. Anyone who has watched a jury's collective body language during this process would hesitate to call such testimony compelling.
The end result is that our court-created common law-inherited from cases decided largely in the early half of the last century-has created a modern system where litigation necessitates frontloaded professional witnesses, even when the reasonableness of medical bills is functionally undisputed.[1] Perhaps when this common law interpretation *43 was originated, a medical bill alone could not meet the incredibly low bar of sufficiency to survive directed verdict, but we no longer live in that world. We live in a modern healthcare economy-an economy where billing is created by highly regulated institutional players for consumption by other highly regulated institutional players. And some of the very regulations under which healthcare providers operate include regulations on billing practices.
The notion that a medical bill from an accredited and regulated healthcare provider is somehow admissible and relevant as to reasonableness-but so meagerly probative that it cannot surmount the incredibly low bar of directed verdict as to reasonableness-is an unsupportable fiction. And while the tapestry of jurisprudence is woven with many imaginary threads, we should hesitate when our fictions impose real world consequences. Every increase in cost to the plaintiff, such as retaining a de facto required *462 professional witness, jeopardizes access to justice for Oregon's injured. And the rote inclusion of these witnesses in every case-in-chief, even when reasonableness is not in serious dispute, renders trials longer and more time consuming for jurors and for our increasingly busy circuit courts.
Despite all those concerns, however, we are bound by precedent. The majority acknowledges that "we and the [Oregon] Supreme Court have suggested that even payment of a bill may be insufficient to create an inference of reasonableness." 296 Or. App. at 28 n. 7, 438 P.3d at 453-54 n. 7. The majority attempts to create a distinction to evade the implications of those past suggestions-from such cases as Valdin -by holding that evidence of payment of a medical bill is sufficient if there is the presence of an additional fact: that the payment comes from an insurer .
The majority asserts that "because there is evidence of reasonableness beyond payment, we need not address whether proof of payment alone can give rise to an inference *44 of reasonableness." 296 Or. App. at 28 n. 7, 438 P.3d at 454 n. 7. While that statement is technically accurate, I do not read it to imply that testimony will be required going forward in all cases. As the majority reasons, reasonableness is the equivalent of "market rate." 296 Or. App. at 30-31, 438 P.3d at 454-55. Further, the majority holds that evidence of payment at market rate can, in and of itself, establish reasonableness. Id . Finally, the majority concludes that insurance companies are "well situated to assess what sums are usual and customary and, therefore, reasonable." Id . at 31, 438 P.3d at 455. As I read the majority opinion, its core holding is that payment by an institutional player in the market, like an insurance company, is evidence of the market rate and, therefore, payment by an insurance company alone is sufficient to establish reasonableness. Thus, the majority opinion does not announce that "payment alone" is sufficient, but it does announce that payment alone by an insurer is sufficient. Id. at 28, 438 P.3d at 453. And, while I commend the majority for pushing back against the status quo in this area, I must reject an attempt to carve out a distinction in precedent that both results in insurance carriers being afforded a superior position from which to dictate reasonableness and creates two different classes of litigants in Oregon courts.
Under the majority's rule, if an uninsured injured Oregonian received, then paid, a medical bill, her lack of privileged status as an institutional player in the market-a status the majority affords to insurance companies-would prevent her own payment from establishing the market rate and, therefore, her payment alone would be insufficient to establish reasonableness. That uninsured plaintiff would likely be forced to go through the expense of hiring a medical billing expert at trial if her treating physician was unable or unwilling to testify on billing matters. Conversely, under the majority's rule, if an insured Oregonian is injured, and his insurance company pays the bill, payment by that corporation alone would be evidence of reasonableness and he would be alieved of the expense of retaining a medical billing expert, should he seek recovery of the amount paid. Thus, I do not agree with the majority when it claims that "[i]n both situations, however, a witness testifies to show that the amounts were 'reasonable.' " 296 Or. App. at 36, 438 P.3d at 458 (emphasis in *45 original). As I read the majority's rule, only the uninsured will need to bring in a medical billing expert witness if they seek to recover the amount paid. For the insured, the mere act of payment by an institutional player is evidence of market rate and, thus, sufficient evidence of reasonableness, obviating the need for an expert witness.
This disparity in treatment is exacerbated by the relationship between civil recovery and criminal restitution. ORS 137.103 provides that a "victim" entitled to criminal restitution includes not only "[t]he person or decedent against whom the defendant committed the criminal offense," but also "[a]n insurance carrier, if it has expended moneys on behalf of a victim described in paragraph (a) of this subsection." ORS 137.103(4)(a), (d). Further, Article I, section 42(d), of the Oregon Constitution guarantees crime victims "[t]he right to receive prompt restitution from the convicted criminal who caused the *463 victim's loss or injury." In many criminal restitution hearings, the money sought by the state is payable to an insurance carrier. This is a regular and routine occurrence throughout trial courts in Oregon and is not "illusory" as the majority claims. 296 Or. App. at 37, 438 P.3d at 458. The simple fact is that, under the majority's rule, the state will have a significantly easier time obtaining restitution payable to an insurer than obtaining restitution payable to the actual victim of the crime. I cannot join in an opinion that privileges the corporate insurers of crime victims over the human victims themselves.
Nevertheless, I might have concurred in the result in this case based on the presence of evidence beyond mere bills or payments in the record. Here, there was testimony by the CareOregon subrogation coordinator, Biglin, that the bills were paid at Medicaid rates that were lower than commercial rates. That testimony could, in theory, serve the same function as testimony by a doctor, or a medical billing professional, as to reasonableness. However, a review of Biglin's testimony evidences that she expressly declined to equate Medicaid rates to reasonableness or to offer any opinion generally as to reasonableness:
"[BIGLIN]: So the 262,000 number, that is the total of the charges. The next column, the $ 47,293.48, that is what CareOregon paid.
*46 "[PROSECUTOR]: And how did CareOregon go from-just for ease-the 262,000 to the 47,293?
"[BIGLIN]: Okay. That is the State Medicaid rates is what we pay, and that's why there's a big difference. Medicaid pays much lower rates than say your standard commercial insurance.
"[PROSECUTOR]: So the rates that you paid were based on the contract?
"[BIGLIN]: It's based on contract and the Medicaid rates, yes.
"[PROSECUTOR]: Okay. Medicaid rates. And you had mentioned that that's much lower than, did you say commercial rates?
"[BIGLIN]: Yes.
"[PROSECUTOR]: Why is that?
"[BIGLIN]: State funding.
"[PROSECUTOR]: Okay. So the total that CareOregon paid out was the $ 40,293.48 (sic )?
"[BIGLIN]: Yes, for the medical, that's correct.
"[PROSECUTOR]: Okay. Do you have-is it solely just based on the medical rates? Do you look at something and say, that's not reasonable or that is reasonable?
"[BIGLIN]: No, we do not. "
(Emphases added.)
Following this question, Biglin was again given the opportunity to equate CareOregon's payment rates to "reasonableness" but again declined:
"[DEFENSE COUNSEL]: But just to clarify, you indicated that your job is not to review the reasonableness of the services, you just get the claims and you're just processing?
"[BIGLIN]: Yes. Usually-a lot of times they go through the system automatically, and then we just, you know, pull all the related claims.
"[DEFENSE COUNSEL]: Okay. And does anyone in your organization review reasonableness of the services provided?
*47 "[BIGLIN]: As a general rule, no , unless there's some sort of question that would come up."
(Emphases added.)
Biglin's testimony offers no opinion on reasonableness. We are left only with the fact that the medical bills were paid by an institutional insurer at a contracted rate. In the majority's view, that fact suffices so as to meet the directed verdict standard for reasonableness of medical expenses. In light of Valdin , and for the reasons previously stated, I cannot join in the majority's opinion and so I respectfully dissent.

The majority opinion appears to take issue with my discussion of the realities of practice, stating that such practice "was not involved in this case, and this decision does not compel that practice." 296 Or. App. at 36, 438 P.3d at 458. Respectfully, Oregon appellate decisions do not exist in technocratic ether. Our decisions live on the muddied fields of trial where they have real effects and impose real costs on real people into the future. It is an essential obligation of this court when we engage in our interpretive process-particularly in the area of common law-to keep a dual focus. With one eye, we look to the limits of the case before us, mindful of what it does, and does not, present. Yet with the other, we gaze upon the wider body of law we have created; asking whether that jurisprudence continues to promote fairness, equality, and access to justice for all Oregonians.